715 A.2d 1018

FRANK SCHNEIDER, JR. AND SUSAN SCHNEIDER, PLAIN-
TIFFS–RESPONDENTS, v. STATE INVESTIGATOR DONALD
SIMONINI AND DEPUTY CHIEF ROBERT T. BUCCINO, DE-
FENDANTS–APPELLANTS, AND NEW JERSEY DIVISION OF
CRIMINAL JUSTICE, STATE INVESTIGATOR JOHN POST,
STATE INVESTIGATOR ANDREW O'CONNOR, CARLOS ROD-
RIGUEZ AND JOHN D'ANGELO, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued May 4, 1998—Decided September 4, 1998.

584

Before Judges NEWMAN, COLLESTER and BILDER.

*Bertram P. Goltz, Jr.*, Deputy Attorney General, argued the cause for appellants (*Peter Verniero*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Mr. Goltz*, on the brief).

*Vincent J. D'Elia*, argued the cause for respondents.

The opinion of the court was delivered by

COLLESTER, J.S.C. (temporarily assigned).

Defendants Donald Simonini and Robert T. Buccino appeal from a final judgment of the Law Division finding Simonini, an investigator with the New Jersey Division of Criminal Justice (DCJ), and Buccino, Deputy Chief Investigator of the DCJ, liable under 42 *U.S.C.A.* § 1983 for violating the civil rights of Frank Schneider by his false arrest and detainment. We reverse on the grounds that defendants were entitled to judgment under the doctrine of qualified immunity.

Plaintiffs Frank Schneider, Jr. and Susan Schneider filed this § 1983 action against defendants Simonini and Buccino as well as other law enforcement officers and agencies based on the wrongful arrest of Frank Schneider, Jr.[1] Motions for summary judgment were granted in favor of other defendants, but the motion judge denied summary judgment to Simonini and Buccino as well as to John Post, another investigator with the DCJ, finding that there were genuine issues of material fact as to the existence of probable cause for plaintiff's arrest. We denied defendants' motion for leave to appeal, and the matter proceeded to a jury trial.

Both sides moved for judgment at the conclusion of testimony. The trial judge dismissed the case against Post based on qualified immunity. However, he found that Simonini and Buccino "demonstrated a deliberate indifference to the existence of probable cause," denied their motion and granted judgment to plaintiffs on liability. The case proceeded to the jury on the sole issue of damages, resulting in an award to plaintiffs of $60,000 against Simonini and $15,000 against Buccino. Defendants' motions for judgment notwithstanding the verdict, as well as for a new trial or remittitur were denied. Plaintiffs' application for counsel fees was granted and a subsequent award was entered for $301,944 to be paid by defendants. This appeal followed.

The pertinent facts are as follows. In October 1988, the Organized Crime Bureau of the DCJ began Operation LeJeune, an investigation of the northern faction of the Bruno/Scarfo organized crime family involved in an alleged conspiracy to commit the crimes of armed robbery, drug dealing and arson. Key to the investigation was the cooperation of Tony Bonura, a turncoat informant who was part of the Bruno/Scarfo crime network. Bonura assisted both by providing inside information and by wearing a wire recorder in conversations with investigation targets. Because disclosure of his cooperation could well result in his death, Bonura's identity was a secret known only to those at the

---

[1] In the body of this opinion "plaintiff" refers to Frank Schneider, Jr.

center of the investigation, which included defendants as well as Deputy Attorney General John Mercun. Simonini was the lead investigator and in charge of Bonura. Buccino was the commander of the Organized Crime bureau of the DCJ. Mercun's responsibilities included consultation with Simonini and Buccino on legal matters including applications for arrest and search warrants prior to submission to a Superior Court judge.

On April 19, 1989, Bonura recorded his conversation with Richard Discorfano, an Operation LeJeune target, in which Discorfano told Bonura that a Mark Vilardi and Frank Schneider, Jr. had botched a hijacking of a truck load of VCRs for Discorfano. The conversation included the following:

A.B. (Anthony Bonura): . . . what about the big load, VCRs, shit like that.

R.D. (Richard Discorfano): That ain't them, that ain't them. Those guys are going into hijacking. Remember, I told you I hired a couple of guys to hijack. Those guys, they don't know what they're doing. They handcuffed a guy in South Jersey, they're bring'em up here, the guys get out of the fuckin' truck, he's knocking on people's fuckin' door.

A.B.: Who stuck them up?

R.D.: They did.

A.B.: Smokey and a . . .

R.D.: No. No. Frankie.

A.B.: Frankie Schneider?

R.D.: Not the father, the son.

A.B.: The son. Yea.

R.D.: Well. Mark right now is involved with the walkie talkie, Frank Schneider does the shit. Know what I'm saying?

Bonura told Simonini that he did not know any Frank Schneider, Jr. and had only a vague recollection of the name. No further information was obtained on the matter until July 10, 1989, shortly before Operation LeJeune was terminated, when Simonini spoke with Robert DeBellis, an FBI Special Agent assigned to the Hijack Squad. During a conversation focused on other matters, DeBellis told Simonini that he had been advised by his confidential informant that Mark Vilardi and Frank Schneider, Jr. had committed an armed hijacking for Richard Discorfano of a truck loaded with VCRs on the New Jersey Turnpike in South Jersey

and had abandoned the truck and cargo after striking a telephone pole in North Jersey, leaving the truck driver bound in the sleeper section of the truck.

DeBellis' informant told him that Vilardi had an arrest record and lived in Paterson. He described Frank Schneider, Jr. as a "big kid" about six to six feet two inches tall with a large muscular build and in his twenties. He said that Schneider lived in the Garfield–Lodi area and that both he and his father had criminal records.

DeBellis told Simonini that the FBI corroborated his informant's information by checking the reports of the State Police and the Hackensack Police Department. These reports confirmed that on December 27, 1988 there was a hijacking at gunpoint of a truck load of Samsung VCRs and televisions near Exit 4 of the New Jersey Turnpike. The driver, Cliff Glidden, had picked up his load at the Samsung warehouse in Saddle Brook, New Jersey and was heading for Maryland when he was hijacked, bound and thrown into the sleeper portion of the tractor. The hijackers later abandoned the tractor trailer and its cargo in Hackensack after striking a light pole in the Little Ferry area.

DeBellis told Simonini that he did not have photographs of Vilardi or Schneider. When Simonini asked DeBellis if his informant could make an identification of the men from photographs, DeBellis said that the informant would be of no assistance. Simonini took the comment to mean that DeBellis would not make his informant available for any identification in order to protect the informant's identity. Simonini followed standard police procedure in not asking DeBellis for the identify of his informant. However, he was assured by DeBellis that the informant had proved reliable in the past and had been independently corroborated by DeBellis and other FBI agents.

Simonini reviewed his files and found that another of his confidential informants had reported that in December 1988, Discorfano asked for help in "moving" a load of stolen video cassette recorders and cosmetics that he expected to receive. He then

received and read the State Police report of the December 27, 1988 hijacking in which Glidden told the State Police that he left Saddle Brook at 2 p.m. and stopped at a Turnpike service area to use the rest room. He said that on his return a man put a gun to his head, handcuffed him behind his back, bound his feet with tape and pushed him to the sleeper berth portion of the truck. Another man got into the truck at a later time, and both hijackers abandoned the truck after an accident. Glidden waited ten minutes, broke the tape off his legs and ran to a nearby house for help.

Glidden said that he saw only one of the hijackers, describing him as a "very strong" Hispanic male, twenty-five to thirty years old, about five feet, eleven inches tall with dark hair, wearing a plaid coat and blue jeans. However, he said that he would not be able to make an identification of the hijacker. The State Police report also indicated that no usable fingerprints or other identifiers were obtained from the crime scene.

Simonini concluded from the State Police report and his conversation with State Police detectives that Glidden would be of little assistance in identifying the hijackers. He also knew that Glidden was an over-the-road trucker and that he would have difficulty contacting him before the termination of Operation LeJeune.

Simonini accessed the Division of Motor Vehicles (DMV) computerized records for "Frank Schneider" and narrowed his list to four men. The first had a Montville address and a birth date in May 1944, which made him too old to fit the description given by Glidden and DeBellis' informant. The second lived in Lincoln Park and was born in July 1964, but his listed height of five feet, eight inches did not fit the "big kid" described by DeBellis' informant. The remaining two men were a Frank J. Schneider of 10 Charles Court, Lodi with a birth date listed of "August 00, 1961" and an eye color of brown, and a Frank J. Schneider, Jr. of 270 Walter Avenue, Hasbrouck Heights, with a listed birth date of August 2, 1961 and an eye color of hazel. Having ruled out the Montville man with a 1944 birth date and the Lincoln Park man of

five feet, eight inches tall, Simonini concluded that the men from the nearby towns of Hasbrouck Heights and Lodi with similar birth dates and heights listed were in fact the same man notwithstanding the slightly different eye color. He testified that in his experience many people involved in criminal activities have multiple driver's licenses with a slight difference in listed personal information. Simonini then ran the name Frank Schneider and the birth date of August 2, 1961 through the State Police Master Name Index of criminal records and received a report listing arrests for burglary, property damage, invasion of privacy and disturbing the peace, which ostensibly corroborated the information from DeBellis' informant that Frank Schneider the hijacker had a criminal record. The report also listed a height of six feet, three inches and a weight of about 150 pounds.

The most recent arrest on the criminal history report of Frank Schneider, Jr. was in Lodi, but Simonini did not make any inquiries about Frank Schneider with the Lodi Police Department, testifying he was concerned about compromising the investigation and possibly endangering Bonura. For similar reasons he did not attempt to obtain a photograph from the Bergen County Probation Department, the Bergen County Jail or the Bergen County Prosecutor's Office. Moreover, there was no one to whom he could show a photograph who could make an identification: Bonura had told him he did not know either Vilardi or Schneider, Glidden had told the State Police he could not make an identification, and DeBellis would not offer the assistance of his informant to identify the men. Simonini did not conduct any surveillance of the suspect Frank Schneider, Jr. and did not investigate whether the suspect's father had a criminal record.

Information of an imminent residential armed robbery by investigative targets precipitated the decision to terminate Operation LeJeune. Simonini prepared fifteen arrest warrants including one for plaintiff Frank Schneider, Jr. of Lodi. His lengthy affidavit detailed in pertinent part the information recorded by Bonura, the information from DeBellis' confidential informant and his own

investigation as to the identity of Frank Schneider, Jr. On July 14, 1989 a Superior Court judge signed the arrest warrants.

The warrants were executed on the morning of July 17, 1989, and all of the men arrested were brought to the West Orange Armory for processing. Assisting in this round-up were members of the DCJ, investigators from the Bergen County Prosecutor's Office and local police. John Post, an investigator with the DCJ Organized Crime Bureau, was the team leader responsible for arresting Frank Schneider at 10 Charles Court, Lodi. He had been told that the suspect had different driver's licenses and different addresses but was not advised of any uncertainty as to his identity.

Post and the assigned Lodi police officers arrived at the plaintiffs' address in Lodi and were told by plaintiff's wife that her husband was working at a construction site in Wyckoff. When he was found, plaintiff was arrested, handcuffed and placed in the back of the police car despite his protest that he was the wrong man.

Throughout the ride to the West Orange Armory, plaintiff continued to say that he was wrongly arrested. Post called Buccino to advise him of the arrest and told him that plaintiff forcefully claimed that a mistake had been made. Buccino told Post to bring him to the West Orange Armory and cover his head to avoid the exposure to the media.

Plaintiff was taken immediately on arrival to the "processing room" where the other men were being held. Mark Vilardi, the other alleged hijacker, announced that plaintiff was not the man police were seeking. Plaintiff testified that Buccino then asked him if he remembered him from the arrest of his father the week before. Plaintiff said that his handcuffs were removed and that he took a photograph of his father from his wallet and gave it to Buccino to check. When another officer confirmed that the man in the photograph was not Frank Schneider, Sr., Buccino and Post said that he was released and ordered that he be driven back to work.

On July 19, 1989 the Attorney General issued a press release stating that the Frank Schneider, Jr. of Lodi who had been arrested two days before had been mistakenly identified as one of the individuals targeted in Operation LeJeune and had been released two hours after his arrest. The statement went on to say that plaintiff had no connection or association with the Bruno/Scarfo crime family and that the Frank Schneider, Jr. who was the target of the investigation was still being sought. The following day a letter was sent from an Assistant Attorney General to plaintiff indicating that the Attorney General had sent the press release to a number of newspapers and news services to abate any negative impact resulting from plaintiff's arrest and detention.

Later investigation led investigators to look for a Frank Schneider, Jr. near Montville. A photograph was obtained from the Montville Police Department of a Frank Schneider, Jr. with addresses both in Montville and Lincoln Park. On August 3, 1989, the Frank Schneider, Jr. being sought turned himself in to authorities. His arrest record described him as five feet, ten inches tall, weighing 200 pounds. He was in fact the man in Simonini's DMV look-up with the Lincoln Park address and the July 1964 birth date.

The trial judge denied defendants' motion for judgment and granted the plaintiffs' cross-motion on the basis of a finding of a lack of probable cause and insufficient investigation into the identity of the real hijacker. In our view the trial judge misconceived the requirement of probable cause and the application of qualified immunity. We hold that Simonini and Buccino were entitled to judgment dismissing the complaint as a matter of law.

▇▇▇▇ Issues of qualified immunity raised in defense to a claim under 42 *U.S.C.A.* § 1983 which allege violation of a constitutional right by a public officer should be considered whenever possible for disposition as a matter of law, especially in the context of an alleged unlawful arrest or unlawful search and seizure. *Harlow v. Fitzgerald,* 457 *U.S.* 800, 815–16, 102 *S.Ct.* 2727, 2736–37, 73 *L.Ed.*2d 396, 408–09 (1982); *Gomez v. Toledo,* 446 *U.S.* 635, 640,

100 *S.Ct.* 1920, 1924, 64 *L.Ed.*2d 572, 577–78 (1980); *Plummer v. Department of Corrections,* 305 *N.J.Super.* 365, 371, 702 *A.*2d 535 (1997); *Kirk v. City of Newark,* 109 *N.J.* 173, 184, 536 *A.*2d 229 (1988). The test is whether the conduct involved was objectively reasonable in the light of clearly established law. *Harlow, supra,* 457 *U.S.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ibid.*

 Since the applicable question is whether a reasonable officer could have believed his or her action as lawful, "in light of clearly established law and the information the … officers possessed," *Anderson v. Creighton,* 483 *U.S.* 635, 641, 107 *S.Ct.* 3034, 3040, 97 *L.Ed.*2d 523, 532 (1987), law enforcement officers are given "ample room for mistaken judgments," *Malley v. Briggs,* 475 *U.S.* 335, 343, 106 *S.Ct.* 1092, 1097, 89 *L.Ed.*2d 271, 280 (1986). The immunity serves to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278.

 Where the § 1983 claim asserts a lack of cause for issuance of a warrant, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable … will the shield of immunity be lost." *Id.* at 344–45, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 281 (citing *United States v. Leon,* 468 *U.S.* 897, 923, 104 *S.Ct.* 3405, 3421, 82 *L.Ed.*2d 677, 699 (1984)). A law officer is entitled to judgment as a matter of law if he or she acted with probable cause or, if probable cause is lacking, that under the known circumstances a reasonable police officer could have believed that probable cause existed. *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229.

In *Hayes v. County of Mercer,* 217 *N.J.Super.* 614, 526 *A.*2d 737 (App.Div.), *certif. denied,* 108 *N.J.* 643, 532 *A.*2d 226 (1987), the plaintiff was arrested in New York State following a motor vehicle stop look-up which revealed an outstanding warrant on a New

Jersey indictment for a person with the identical first and last names. Other similarities included age and occupation. The plaintiff's lawyer refused to permit his client's photograph to be taken. An extradition warrant was obtained, which was subsequently dismissed after the victim was unable to make an identification. *Id.* at 618–19, 526 *A.*2d 737.

Speaking to the issue of qualified immunity by a prosecutor's investigator, we said

[w]e are satisfied that the marked similarities between facts known about the indicted man and facts known about plaintiff coupled with plaintiff's undenied refusal to submit to even a photographic identification, established the objective reasonableness of the investigator's conduct. Even though the investigator was not certain that plaintiff was the right man and even if the investigator's conduct contributed to the decision by the prosecutor and the assistant prosecutor to institute extradition proceedings against the wrong man, the investigator was entitled to summary judgment on plaintiffs' § 1983 claim.

*Id.* at 621, 526 *A.*2d 737.

■ Information received and developed by Simonini in this case gave him a reasonable objective belief in the existence of probable cause that plaintiff was one of the hijackers. The recorded conversation between Bonura and Discorfano spoke of a botched hijacking involving "Frankie Schneider." The information received from DeBellis' informant named one of the perpetrators as a Frank Schneider, Jr. and described him as a "big kid" in his twenties with a criminal record who lived in the Garfield and Lodi area. Simonini was entitled to rely on the information supplied by an FBI informant described as reliable, and in fact the informant's description of the details of the crime were verified by the victim and the investigative police reports. *See State v. Novembrino,* 105 *N.J.* 95, 120–22, 519 *A.*2d 820 (1987). Moreover, Simonini's investigation of relevant records confirmed that plaintiff's appearance, address and criminal history were consistent with the other information supplied as to one of the hijackers. *See United States v. Williams,* 10 *F.*3d 1070, 1075 n. 6 (4th Cir.1993), *cert. denied,* 513 *U.S.* 926, 115 *S.Ct.* 313, 130 *L.Ed.*2d 276 (1994); *Powe v. City of Chicago,* 664 *F.*2d 639, 645 (7th Cir.1981).

The fact that Simonini did not conduct a more detailed investigation does not deprive him of qualified immunity. His concern over potential seepage of information that would disclose Operation LeJeune and endanger Bonura's life was reasonable in light of the nature of the overall investigation. While twenty-twenty hindsight may suggest other steps that could have been taken to insure certainty in the identification of the criminal Frank Schneider, Jr., the test for qualified immunity is not certain or even actual probable cause, but rather arguable probable cause. *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229; *see also Lee v. Sandberg,* 136 *F.*3d 94, 102–03 (2d. Cir.1997); *Madiwale v. Savaiko,* 117 *F.*3d 1321, 1324 (11th Cir.1997); *Johnson v. Schneiderheinz,* 102 *F.*3d 340, 341 (8th Cir.1996); *Von Stein v. Brescher,* 904 *F.*2d 572, 579 (11th Cir.1990); *Green v. City of Welch,* 822 *F.Supp.* 1236, 1239–40 (S.D.W.Va.1993). Even plaintiffs' expert did not testify that no reasonable police officer would conclude that an arrest warrant could issue under the circumstances or that officers of reasonable competence could not disagree on the issue of probable cause for a warrant. Our review of the record in the light most favorable to plaintiffs leads us to conclude that there was at least arguable probable cause and that Simonini was therefore entitled to qualified immunity for his conduct.

With respect to Buccino, the rationale for qualified immunity is stronger since he committed no acts leading to plaintiff's arrest. Responsibility under § 1983 cannot rest on respondeat superior. *Monell v. Department of Soc. Servs.,* 436 *U.S.* 658, 691–92, 98 *S.Ct.* 2018, 2036–37, 56 *L.Ed.*2d 611, 636 (1978). To affix liability to a supervisor there must be a showing that he had actual or constructive knowledge of the misconduct and that his failure to take action had causal connection to the constitutional violation. *See Post v. City of Fort Lauderdale,* 7 *F.*3d 1552, 1560–61 (11th Cir.1993), *modified on other grounds,* 14 *F.*3d 583 (11th Cir.1994); *Hansen v. Black,* 885 *F.*2d 642, 645–46 (9th Cir.1989); *Gutierrez–Rodriguez v. Cartagena,* 882 *F.*2d 553, 562 (1st Cir.1989); *Skevofilax v. Quigley,* 586 *F.Supp.* 532, 543 (D.N.J.1984). Here there is

no such showing. Moreover, there was no constitutional violation by Buccino by virtue of our determination that Simonini was entitled to qualified immunity.

While there is no question that plaintiff was wrongly arrested, that singular fact is not in itself determinative in an action brought under § 1983. *See Thompson v. Prince William County,* 753 *F.*2d 363, 364–65 (4th Cir.1985). Practical difficulties and inherent ambiguities in law enforcement are such that mistakes will at times be made by police officers, and there must be leeway for some mistakes when officers act reasonably. *See Brinegar v. United States,* 338 *U.S.* 160, 176–77, 69 *S.Ct.* 1302, 1311, 93 *L.Ed.*2d 1879, 1891 (1949).

In the instant case we find that the application for the arrest warrant was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable ..." *Malley, supra,* 475 *U.S.* at 344–45, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 281. Defendants were entitled to assert and prevail on grounds of qualified immunity, and the trial court erred in denying their applications for dismissal and entering judgment for plaintiffs. In view of our determination that plaintiffs did not prevail under § 1983, the order awarding counsel fees is also vacated. 42 *U.S.C.A.* § 1988(b).

Reversed.