749 A.2d 336

FRANK SCHNEIDER, JR., AND SUSAN SCHNEIDER, PLAIN-
TIFFS–APPELLANTS, v. STATE INVESTIGATOR DONALD SI-
MONINI AND DEPUTY CHIEF ROBERT T. BUCCINO, DEFEN-
DANTS–RESPONDENTS, AND NEW JERSEY DIVISION OF
CRIMINAL JUSTICE, STATE INVESTIGATOR JOHN POST,
STATE INVESTIGATOR ANDREW O'CONNOR, CARLOS ROD-
RIGUEZ AND JOHN D'ANGELO, DEFENDANTS.

Argued November 8, 1999—Decided March 6, 2000.

338

340

342

344

*Vincent J. D'Elia*, argued the cause for appellants.

*Glenn R. Jones*, Deputy Attorney General, argued the cause for respondents (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel, *Bertram P. Goltz, Jr.*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal involves a claim for a constitutional violation brought under 42 *U.S.C.A.* § 1983 (Section 1983). We are asked primarily to decide whether sufficient probable cause existed to arrest Frank Schneider, Jr. (plaintiff) and, if not, whether defendants otherwise are entitled to qualified immunity. We must also revisit our summary judgment standard explicated in *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), and adjudge whether the trial court or the jury should decide certain factual and legal disputes in Section 1983 cases. We hold that probable cause did not exist to arrest plaintiff. A majority of the Court however, holds that even in the absence of probable cause defendant Simonini is entitled to qualified immunity because he could reasonably have believed in its existence. We also hold that defendant Buccino is not liable as a supervisor under the standard adopted today. Accordingly, the judgment of the Appellate Division is affirmed.

I.

Although the facts are, for the most part, undisputed, different inferences may be drawn from those facts. In October 1988, the Organized Crime Bureau of the New Jersey Division of Criminal Justice (DCJ) began Operation LeJeune, a ten-month investigation into the Bruno/Scarfo organized crime family. Defendant Donald Simonini, the lead investigator, and defendant Robert

Buccino, commander of the Organized Crime Bureau of the DCJ, were two key members of Operation LeJeune.

From the beginning of the investigation, Simonini was assisted by a confidential informant named Anthony Bonura, who aided the investigation by providing inside information. Bonura's identity remained confidential throughout most of the investigation. The name Frank Schneider first surfaced after a tape recorded conversation on April 19, 1989 between Bonura and Richard Discorfano, an Operation LeJeune target, which revealed that two men, Frank Schneider and Mark Vilardi, were involved in hijacking a truckload of VCRs. The recorded conversation revealed, in pertinent part:

Bonura: ... what about the big load, VCRs, shit like that.

Discorfano: That ain't them, that ain't them. Those guys are going into hijacking. Remember, I told you I hired a couple of guys to hijack. Those guys, they don't know what they're doing. They handcuffed a guy in South Jersey, they're bring'em up here, the guys get out of the fuckin' truck, he's knocking on people's fuckin' door.

Bonura: Who stuck them up?

Discorfano: They did.

Bonura: Smokey and a ...

Discorfano: No. No. Frankie.

Bonura: Frankie Schneider?

Discorfano: Not the father, the son.

Bonura: The son. Yea.

Discorfano: Well. Mark right now is involved with the walkie talkie; Frank Schneider does the shit. Know what I'm saying?

Bonura told Simonini that he did not know Frank Schneider, Jr. Thereafter, on July 10, 1989, Simonini was informed by FBI Special Agent Robert DeBellis that a Mark Vilardi and a Frank Schneider, Jr., had committed an armed hijacking of a truckload of VCRs on the New Jersey Turnpike for Richard Discorfano. According to Simonini, DeBellis told him that the hijackers abandoned the truck and its cargo and left the truck driver, Cliff Glidden, bound in the sleeper section of the truck after they struck a telephone pole in northern New Jersey. DeBellis also gave Simonini a description of Schneider relayed to him by his infor-

mant: a "big kid" between six and six feet two inches tall with a large muscular build and in his twenties. He told Simonini that Schneider and his father had criminal records and that the son lived in the Garfield–Lodi area. Simonini testified that, although DeBellis told him that there was a Frank Schneider, Sr., he was never told that Frank Schneider, Sr. had a criminal record. That is the only disputed relevant fact in the record. Finally, Simonini was told that Vilardi had an arrest record and lived in Paterson.

DeBellis mentioned to Simonini that the FBI had verified some of the informant's information by checking police reports. The reports confirmed that two men hijacked a truckload of VCRs on the New Jersey Turnpike on December 27, 1988, and that they bound the driver with tape, threw him in the sleeper portion of the truck, and abandoned the truck and its cargo in Hackensack.

Based on that information, Simonini began his search to find Schneider and Vilardi. Simonini inquired whether DeBellis's informant could identify Schneider or Vilardi, or whether there were any photographs Simonini could use to assist in his search for the hijackers. DeBellis told Simonini that neither he nor his informant could provide additional assistance, but that his informant had proven to be reliable in the past.

Simonini obtained access to the police reports on the hijacking and learned that no fingerprints were found at the scene. The truck driver, Glidden, gave a general description of one of the hijackers, whom he described as a "very strong" Hispanic male, twenty-five or thirty years old, about five feet eleven inches tall with dark hair, wearing a plaid coat, blue jeans and sunglasses. Subsequent to plaintiff's arrest, Glidden picked out the real hijacker from a photo line-up in August 1990. However, Simonini was unable to contact Glidden during the investigation.

Simonini accessed the Division of Motor Vehicles' (DMV) computerized records for "Frank Schneider" and found several individuals with that name. Based on information he received from DeBellis and Glidden, he narrowed the field down to four "Frank Schneiders." Two of those men were ruled out as suspects. The

first Frank Schneider, who had a Montville address and was born in 1944, was eliminated because he was too old to fit the description given by Glidden and DeBellis's informant. The second Frank Schneider, who lived in Lincoln Park and was born in July 1964, was eliminated because his listed height, five feet eight inches, did not fit the "big kid" description given by DeBellis's informant. The other two men were a Frank J. Schneider who lived at 10 Charles Court in Lodi with a listed birth date of "August 00, 1961" and an eye color of brown, and a Frank J. Schneider, Jr., who lived at 270 Walter Avenue in Hasbrouck Heights with a listed birth date of August 2, 1961, and an eye color of hazel. Based on the similarities between the remaining two men, Simonini concluded that the two men were in fact the same person. He testified that, in his experience, many people involved in criminal activities have more than one driver's license with slightly different personal information.

Simonini then ran the name Frank Schneider and the birth date August 2, 1961, through the State Police Master Index. He obtained a report stating that that particular Frank Schneider, plaintiff, was six feet three inches tall and weighed about 150 pounds. The reports also reflected arrests for burglary, property damage, invasion of privacy, and disturbing the peace. Simonini believed those arrests corroborated the information from DeBellis's informant that Frank Schneider, the suspected hijacker, had a criminal record. After reviewing that information, Simonini contacted DeBellis again to determine whether he had any additional identifying characteristics for Frank Schneider; DeBellis told him he did not. Simonini testified that he did not obtain photographs or make any inquiries about Frank Schneider at the police station or at any other law enforcement agency or correctional facilities in his criminal history report because he did not want to jeopardize the investigation or endanger Bonura, and because there was no one to whom he could show the photographs. Simonini did not investigate whether the suspect's father had a criminal record. At that point, Simonini concluded his investigation.

Operation LeJeune was terminated on July 17, 1989, when information was received about an imminent residential armed robbery. The day before, Simonini reviewed the evidence he had against Vilardi and plaintiff with his legal staff who concluded that probable cause existed to make the arrests. Simonini then added plaintiff's and Vilardi's names to his 138–page affidavit, which sought arrest and search warrants for thirteen suspected criminals who were targets of Operation LeJeune. With regard to Schneider, Simonini's affidavit described the conversation recorded by Bonura, the information concerning the hijacking related by DeBellis's confidential informant, and the corroboration of the informant's information through investigative police reports and information from Glidden, the driver of the hijacked truck. Simonini did not include in the affidavit, however, Schneider's physical description, address or age. Based on the content of the affidavit that related to the hijacking, which comprised three pages in an otherwise 138–page affidavit, a Superior Court judge issued separate arrest warrants on July 14, 1989 for Schneider and Vilardi. Warrants were also issued for the other thirteen suspects.

Plaintiff and other Operation LeJeune targets were arrested on July 17, 1989. Plaintiff was arrested at his job by John Post, an investigator with the DCJ Organized Crime Bureau, despite his protests that he was the wrong man. Post had been told that the suspect had different driver's licenses and different addresses, but he was not advised of any uncertainty regarding his identity. Post called Buccino to inform him that plaintiff had been arrested and that plaintiff was forcefully and repeatedly claiming that a mistake had been made. Buccino instructed Post to transport plaintiff to the West Orange Armory and cover his head to avoid any media exposure.

Upon his arrival at the West Orange Armory, plaintiff was taken to the processing room where the other Operation LeJeune targets were being held. According to plaintiff, Buccino asked him whether he remembered him from the arrest of his father

from the week before. Plaintiff responded, "[W]hat are you talking about, my father has never gotten a parking ticket before." Mark Vilardi, the other suspected hijacker, was in the room and informed the police that plaintiff was not the right man. Plaintiff eventually removed a picture of his father from his wallet and gave it to Buccino to check, at which point Buccino left the room. When another officer, Edward Ronald Donahue, confirmed that the man in the picture was not Frank Schneider, Sr., plaintiff was released and driven back to work.

On August 3, 1989, the Frank Schneider, Jr. who was involved in the hijacking turned himself in to authorities. He lived near Montville. After checking the police records at the Montville Police Department, investigators learned that the Frank Schneider, Jr. they had been seeking had addresses in Montville and Lincoln Park, was five feet ten inches tall, and weighed 200 pounds. As it turned out, this Frank Schneider, Jr. was the man Simonini had found in the DMV's records with the Lincoln Park address and the July 1964 birth date.

Plaintiffs Frank Schneider, Jr. and his wife, Susan Schneider, filed this Section 1983 action against Simonini, Buccino, and Post, as well as other law enforcement officials and agencies, based on the wrongful arrest and detainment of Frank Schneider, Jr. The trial court granted summary judgment to all defendants except Simonini, Post, and Buccino. As to them, the trial court found that there were genuine issues of material fact concerning the existence of probable cause for plaintiff's arrest.

A jury trial was held during which several officers and an expert on police procedures testified. They indicated that the investigation into the identity of Frank Schneider, Jr. was not thorough and did not conform to standard police procedures. The expert conceded, however, that the existence of information that would tend to point away from a particular person does not independently demonstrate that the investigative officer acted improperly.

During the trial, Buccino described his role in Operation Le-Jeune. He stated that his "function [was] to give [his staff] what they needed to get the job done." Buccino spoke specifically about Simonini. He stated:

> In the case of Don Simonini, I wouldn't ask the question do you have probable cause. There is an attorney sitting right along side of him. If Don Simonini had one-year experience as a law enforcement officer, yes, I would, I would go up to him and say, sure, let's go over your probable cause because that would be my job.... [W]ith the people that I have in the organized crime [agency] they're all experienced, well-trained, I don't ask those questions....

At the close of all the evidence, both sides moved for judgment on liability pursuant to *Rule* 4:40–1. The trial court directed a verdict on liability in favor of plaintiff. In finding that defendants lacked probable case, the trial court stated:

> There was not a shred of evidence to tie [plaintiff] to the hijacking. And a little bit more scrutiny by the agents of the State would have assisted them in concluding that. They had no physical observations. They had no weapon. They had no physical evidence of a robbery. They had nobody who could identify this plaintiff. Nothing that DeBellis said ... should have led them to this plaintiff without more inquiry. [They] did not inquire as to whether the plaintiff's father had a criminal record. [They] made but a cursory examination as to where this plaintiff lived. They did not inquire or they didn't care if there was any person anywhere who could identify what this Frank Schneider looked like.
>
> Mr. Simonini, indeed, made the conclusion that this was his man after he pulled up the DMV check and concluded that merely because this fellow had two addresses, one of which was in Lodi and the other which was in Hasbrouck Heights without knowing more, without knowing at this point whether his father had committed a crime, at that point he concluded that this was his man.

After determining that defendants lacked probable cause, the trial court dismissed the case against Post based on qualified immunity. Buccino and Simonini, however, were not so fortunate. In determining that Simonini was not entitled to qualified immunity, the court stated:

> He relied on confidential informants who were untested. He relied on confidential informants .as to whom he had no personal knowledge. He had no physical evidence. He had no photograph. He had a variety of names and he centered on the two that were most convenient to him. He did not inquire into the status of the father even though one of the informants on whom he relied said the father had a criminal record.

With respect to Buccino, the trial court stated that it was "a little bit more problematic[,] but the end result is the same." The court stated:

> [Buccino] manifested a deliberate indifference here by failing to ask "What is the probable cause to bring these guys in? I never heard of this name before two days ago. Can anybody identify him? Why are you sending … an arrest team out with two address? How do we know which address is the right one?"
>
> These are the type of questions that should be asked about.

In sum, the trial court concluded that Simonini and Buccino "demonstrated a deliberate indifference as to the existence of probable cause and [as to] the true identity of the person Frank Schneider that they were seeking." Thus, the trial court denied Simonini's and Buccino's motions for judgment and granted judgment for liability in favor of plaintiffs.

The court submitted the issue of damages to the jury. The jury awarded plaintiffs damages of $60,000 against Simonini and $15,000 against Buccino. Plaintiffs were awarded counsel fees of $301,944 to be paid by defendants. Defendants' post-trial motions for judgment notwithstanding the verdict, and for a new trial or a remittitur, were denied. Plaintiff committed suicide three days after the post-trial motions had been denied.[1]

Defendants appealed, arguing essentially that they were entitled to qualified immunity because there was probable cause, or, at the very least, a reasonable officer would have concluded that probable cause existed. The Appellate Division reversed the judgment in favor of plaintiffs, concluding that defendants were entitled to qualified immunity. 314 *N.J.Super.* 583, 596, 715 *A.2d* 1018 (1998). It was of the view that "[a] law officer is entitled to judgment as a matter of law if he or she acted with probable cause or, if probable cause is lacking, that under the known circumstances a reasonable police officer could have believed that probable cause existed." *Id.* at 593, 715 *A.2d* 1018 (citing *Kirk v. City of Newark*, 109 *N.J.* 173, 184, 536 *A.2d* 229 (1988)).

---

[1] We express no opinion regarding whether the complaint should be amended pursuant to *Rule* 4:34–1(b) to substitute an executor or administrator.

The Appellate Division reasoned that although Simonini could have conducted a more detailed investigation, "there was at least arguable probable cause and ... Simonini was therefore entitled to qualified immunity for his conduct." *Id.* at 595, 715 *A.*2d 1018. With regard to Buccino, the Appellate Division stated that "the rationale for qualified immunity is stronger since he committed no acts leading to plaintiff's arrest." *Ibid.* Relying on federal case law, the panel explained that "[t]o affix liability to a supervisor there must be a showing that he had actual or constructive knowledge of the misconduct and that his failure to take action had [a] causal connection to the constitutional violation." *Ibid.* In addition, the panel extrapolated that since it had found no constitutional violation by Simonini, it could not find a constitutional violation with regard to Buccino. *Id.* at 596, 715 *A.*2d 1018. We granted plaintiffs' petition for certification. 158 *N.J.* 685, 731 *A.*2d 45 (1999).

## II.

### A.

Plaintiff's claim arises under 42 *U.S.C.A.* § 1983, which provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[42 *U.S.C.A.* § 1983].

Essentially, Section 1983 provides a cause of action for a person who has been deprived of his or her well-established federal constitutional or statutory rights by any person acting under the color of state law. *Gomez v. Toledo,* 446 *U.S.* 635, 640, 100 *S.Ct.* 1920, 1923, 64 *L.Ed.*2d 572, 577 (1980); *Kirk, supra,* 109 *N.J.* at 185, 536 *A.*2d 229. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald,* 457 *U.S.* 800, 818, 102 *S.Ct.* 2727, 2738, 73 *L.Ed.*2d 396, 410 (1982). The objective reasonable person standard for Section 1983 cases, however, does not impose liability "for violations of duties of care arising out of tort law." *Baker v. McCollan,* 443 *U.S.* 137, 146, 99 *S.Ct.* 2689, 2695, 61 *L.Ed.*2d 433, 443 (1979).

■ The standard we apply today to determine whether a police officer has immunity in Section 1983 cases has evolved over the years. A police officer alleged to have violated an arrestee's well-established constitutional or statutory rights may be exonerated from civil liability by invoking the doctrine of qualified immunity. Qualified immunity is an affirmative defense that the defendant must establish. *Gomez, supra,* 446 *U.S.* at 640–41, 100 *S.Ct.* at 1923–24, 64 *L.Ed.*2d at 577–78. "Qualified immunity is also referred to as executive or good faith immunity." Henk J. Brands, Note, *Qualified Immunity and The Allocation of Decision–Making Functions Between Judge and Jury,* 90 *Colum. L.Rev.* 1045, 1045 n. 1 (1990) (Brands, *Qualified Immunity*).

■ One of the elements of qualified immunity, originally established in *Wood v. Strickland,* 420 *U.S.* 308, 322, 95 *S.Ct.* 992, 1000–01, 43 *L.Ed.*2d 214, 225 (1975), required a showing of the absence of malice. That standard was modified seven years later to remove the malice element. *Harlow, supra,* 457 *U.S.* at 815–19, 102 *S.Ct.* at 2736–38, 73 *L.Ed.*2d at 408–11. The standard for qualified immunity established in *Harlow* is whether an executive official, such as a police officer, violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* 457 *U.S.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410. If the official did not violate clearly established constitutional or statutory law, he or she would have immunity. But if the official violated "clearly established law," the focus then shifts to a consideration of "extraordinary circumstances" that require the official to "prove that he [or she] neither knew nor should have known of the relevant legal standard." *Harlow, supra,* 457 *U.S.* at 819, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 411. The

"clearly established law" requirement has a temporal component that obligates a court to judge an official's conduct based on the state of the law and facts that existed at the time of the alleged statutory or constitutional violation. *Anderson v. Creighton,* 483 *U.S.* 635, 639, 107 *S.Ct.* 3034, 3038, 97 *L.Ed.*2d 523, 530 (1987).

The Court in *Anderson* further redefined the standard for determining whether qualified immunity exists as "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the arrestee's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. [The searching or arresting officers'] subjective beliefs about the search are irrelevant." *Anderson, supra,* 483 *U.S.* at 641, 107 *S.Ct.* at 3040, 97 *L.Ed.*2d at 532. Essentially, "[d]etermining whether a [police officer] is entitled to qualified immunity 'requires a two-part inquiry: (1) was the law governing the [police officer's] conduct clearly established? (2) Under that law could a reasonable [police officer] believe his conduct lawful?' " *Liston v. County of Riverside,* 120 *F.*3d 965, 975 (9 th Cir.1997) (citation omitted).

One year after *Anderson* was decided, this Court rearticulated the *Harlow* standard for determining whether a police officer will be immune from liability in Section 1983 cases. A police officer being sued for violating a clearly established constitutional or statutory provision is entitled to judgment if the police officer can successfully prove: (1) that he or she acted with probable cause; or, (2) "even if probable cause did not exist, that a reasonable police officer could have believed in its existence." *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229. The critical issue in this case is whether defendants are immune from liability under the *Kirk* standard for not properly identifying hijacker Frank Schneider, Jr.

## B.

Although procedurally, qualified immunity is deemed to be an affirmative defense to alleged constitutional or statutory

violations in Section 1983 actions, resolution of immunity issues should occur "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 *U.S.* 224, 227, 112 *S.Ct.* 534, 536, 116 *L.Ed.*2d 589, 595 (1991); *Mitchell v. Forsyth,* 472 *U.S.* 511, 526, 105 *S.Ct.* 2806, 2815, 86 *L.Ed.*2d 411, 425 (1985). The Court in *Hunter* observed that it was improper to routinely submit the issue of immunity to a jury. "Immunity ordinarily should be decided by the court long before trial." *Hunter, supra,* 502 *U.S.* at 228, 112 *S.Ct.* at 537, 116 *L.Ed.*2d at 596. To advance the announced policy of early disposition of the qualified immunity defense before trial, we reaffirm our belief that the summary judgment standard should be used. *See Mitchell, supra,* 472 *U.S.* at 526, 105 *S.Ct.* at 2815, 86 *L.Ed.*2d at 425 at (indicating that defendant should be entitled to summary judgment before discovery if the law was not clearly established).

Notwithstanding this Court's conclusion that qualified immunity should be "presented for determination on motions for summary judgment," *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229, we have never expressly held whether the judge or jury should decide disputed facts that are relevant to the immunity issues. *Kirk* decided the immunity issue as a matter of law. *Id.* at 187, 536 *A.*2d 229. The alleged constitutional transgression in the present case is that the Fourth Amendment was violated because plaintiff was arrested without probable cause to believe that he was one of the hijackers. In the traditional criminal law context, trial judges sit as both the factfinder and the arbiter of the law when deciding suppression motions (*see Rule* 3:5–7) under the Fourth Amendment. *Kirk, supra,* 109 *N.J.* at 186, 536 *A.*2d 229.

One commentator has framed the questions in this way: "[I]f there is a genuine dispute as to what actually happened, may the trial judge resolve these factual disputes? ... [I]f the judge has not granted summary judgment, in what fashion, if at all, should he submit the qualified immunity inquiry to the jury?" Brands, *Qualified Immunity, supra,* 90 *Colum. L.Rev.* at 1051.

When addressing the question whether the judge or jury should decide disputed facts essential to a determination of qualified

immunity, the Court in *Kirk* properly concluded that we should look to federal law. *Kirk, supra,* 109 *N.J.* at 186, 536 *A.*2d 229. Indeed, the Supreme Court in *Hunter,* decided three years after *Kirk,* stated that immunity should ordinarily be decided by the court, not the jury, and that determination should be made long before trial. *Hunter, supra,* 502 *U.S.* at 228, 112 *S.Ct.* at 536–37, 116 *L.Ed.*2d at 596. We must answer today what *Kirk* did not decide: how to resolve the qualified immunity issues when facts that are essential to those determinations are disputed. The ebb and flow of federal qualified immunity jurisprudence since *Hunter* has not been uniform.

The Supreme Court has never specifically addressed the question directly, and has, in fact, clouded the issue with its language in *Hunter.* There, the Court reversed the Ninth Circuit, which had held that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact." *Bryant v. United States Treasury Dep't, Secret Serv.,* 903 *F.*2d 717, 721 (9th Cir.1990). The Court determined that the Ninth Circuit was incorrect because its holding "routinely places the question of immunity in the hands of the jury." *Hunter, supra,* 502 *U.S.* at 228, 112 *S.Ct.* at 537, 116 *L.Ed.*2d at 596. By further stating that "[i]mmunity ordinarily should be decided by the court long before trial," *ibid.,* the Court evidenced an intention to remove from the jury the issue of qualified immunity. Clearly, the Court meant immunity to be a legal issue to be decided by the court. *See Anderson, supra,* 483 *U.S.* at 640 n. 2, 107 *S.Ct.* at 3039 n. 2, 97 *L.Ed.*2d at 530 n. 2; *Mitchell, supra,* 472 *U.S.* at 526, 105 *S.Ct.* at 2815, 86 *L.Ed.*2d at 425; *Harlow, supra,* 457 *U.S.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410–11.

The problem is that the Court did not specify what it meant by "ordinarily." What is non-ordinary and how should those non-ordinary cases be decided? With little guidance from the Supreme Court in this area, determining who decides the issue of qualified immunity at trial when there are disputed facts has resulted in inconsistent decisions by federal courts.

A majority, although not an overwhelming majority, of federal circuits have held that, when deciding a motion for summary judgment where there are disputed material facts, a jury should resolve those disputed facts, but the ultimate question of objective reasonableness should be determined by the court. The following decisions (grouped together by circuit) have interpreted *Hunter* as requiring the trial court to make the objective reasonableness determination: *Swain v. Spinney,* 117 *F.*3d 1, 10 (1 st Cir.1997); *Tierney v. Davidson,* 133 *F.*3d 189, 194 (2d Cir.1998); *Warren v. Dwyer,* 906 *F.*2d 70, 74–75 (2d Cir.), *cert. denied,* 498 *U.S.* 967, 111 *S.Ct.* 431, 112 *L.Ed.*2d 414 (1990); *Rogers v. Powell,* 120 *F.*3d 446, 454 (3 rd Cir.1997); *Sharrar v. Felsing,* 128 *F.*3d 810, 828 (3 rd Cir.1997); *Karnes v. Skrutski,* 62 *F.*3d 485, 491 (3 rd Cir.1995); *Buonocore v. Harris,* 65 *F.*3d 347, 359–60 (4 th Cir.1995); *Lampkin v. City of Nacogdoches,* 7 *F.*3d 430, 435 (5 th Cir.1993); *Williams v. Pollard,* 44 *F.*3d 433, 435 (6 th Cir.1995); *Engle v. Townsley,* 49 *F.*3d 1321, 1323 (8 th Cir.1995); and *Cottrell v. Caldwell,* 85 *F.*3d 1480, 1487–88 (11 th Cir.1996).

Other courts have reached different conclusions and have held that, if the existence of disputed facts prevents the issue of qualified immunity from being decided on summary judgment, those disputed facts, along with the question of objective reasonableness, should be submitted to the jury, just like any other mixed question of law and fact. *See Oliveira v. Mayer,* 23 *F.*3d 642, 649 (2d Cir.1994); *Hamrick v. City of Eustace,* 732 *F.Supp.* 1390, 1395 (E.D.Tex.1990). One reason given is that "[i]mmunity's shield against suit is lost, of course, when police officer defendants go to trial. At that point, if—and this is a big if—there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question." *Presley v. City of Benbrook,* 4 *F.*3d 405, 410 (5 th Cir.1993); *see also Sloman v. Tadlock,* 21 *F.*3d 1462, 1468 (9 th Cir.1994) (stating a jury, properly instructed, can decide reasonableness of officer's conduct in light of factual context in which it takes place).

We agree with the District Court of Wyoming in its analysis of the dilemma created by the language in *Hunter:*

> It appears that the way to reconcile these seemingly conflicting mandates is to understand that although a genuine issue of material fact precludes the entry of qualified immunity prior to trial, it does not prevent the defendant from reasserting the defense at trial. In other words, while a factual issue defeats the "immunity from suit" component of the qualified immunity, the defendant will still retain the right to renew this motion at trial in an effort to avail himself of the "immunity from liability" component of the defense.

> . . . .

> [T]his Court can infer the proper method for raising this defense during subsequent proceedings. First, the defendant bears the burden of establishing that his actions were reasonable, by a preponderance of the evidence, because qualified immunity is an affirmative defense under *Harlow* . . . . Second, while the ultimate issue of whether the defendant is entitled to qualified immunity is a legal question, it appears that the underlying factual question as to the reasonableness component is a question for the trier of fact—since there was a genuine issue of material fact relating to this question in the first place. Thus, in order to reassert this claim "at" trial, the Court would submit an interrogatory to the jury so that it may resolve this factual issue. The Court can then determine the legal issue of qualified immunity based on the jury's answer to this interrogatory.

> [*Gardetto v. Mason,* 854 *F.Supp.* 1520, 1530–32 (D.Wyo.1994) (internal citations omitted).]

Because the Supreme Court has explicitly stated that qualified immunity is a legal issue and has suggested that it be decided by the court, and because a majority of federal circuit courts, both before and after *Hunter,* have held that qualified immunity is to be decided by the court, we hold that the issue of qualified immunity is to be determined by the trial judge. That means the judge must decide whether probable cause existed, and if not, whether the executive official could reasonably have believed in its existence. Where historical or foundational facts that are critical to those determinations are disputed, the jury should decide those disputed facts on special interrogatories. The jury's role "should be restricted to the who-what-when-where-why type of historical fact issues." *Cottrell, supra,* 85 *F.*3d at 1488. Based on the jury's factual findings, the trial judge must then make the legal determination of whether qualified immunity exists.

■ In the present case there was at least one disputed fact regarding immunity: whether Special Agent DeBellis informed Simonini that hijacker Frank Schneider, Jr.'s father had a criminal record. The trial judge, not the jury, resolved that issue against defendants. Under our analysis, that was harmless error.

■ The parties made cross-motions for judgment in their favor on the immunity issue at the close of all the evidence. *See R.* 4:40–1. Analytically, the standard for determining summary judgment motions is similar to that required for an involuntary dismissal under *Rule* 4:37–2(b), and also applies when deciding motions under *Rule* 4:40–1 and *Rule* 4:40–2. *Brill, supra,* 142 *N.J.* at 535, 666 *A.*2d 146. When a search or seizure, or both, occur pursuant to a warrant, the existence of probable cause is presumed to have existed for purposes of a Section 1983 cause of action based on an alleged Fourth Amendment violation. A plaintiff seeking recovery must then prove by a preponderance of the evidence that probable cause did not exist. If probable cause is found to have existed, then judgment should be entered for the law enforcement official as a matter of law. If probable cause did not exist, however, the trial court must then decide whether a reasonable police official could have believed in its existence.

■ To recapitulate, we hold that in Section 1983 cases when disputed historical facts are relevant to either probable cause or the existence of a reasonable, but mistaken, belief concerning its existence, the trial court must submit the disputed factual issue to the jury in the form of special interrogatories for resolution by the jury. After receipt of the jury's answers, the trial judge must then decide the legal issue of whether probable cause existed and, if not, whether a reasonable police official could have believed in its existence. Regarding the reasonableness of the belief, in the absence of probable cause, the judge must decide whether the defendant has proven by a preponderance of the evidence that his or her actions were reasonable under the particular facts. That means the traditional *Brill* summary judgment procedure is being modified to accommodate the special needs of

Section 1983 cases in order to comply with federal decisional law. Such a modification, however, does not affect the parties' right to trial by jury. "A jury resolves factual not legal, disputes.... Thus, the right of trial by jury remains inviolate." *Brill, supra,* 142 *N.J.* at 537, 666 *A.*2d 146.

## III.

Next, we focus on whether the meaning of probable cause was clearly established law on July 17, 1989 when plaintiff was arrested, and whether or not the question of the existence of probable cause to arrest plaintiff was properly decided by the trial judge. *Brinegar v. United States,* 338 *U.S.* 160, 69 *S.Ct.* 1302, 93 *L.Ed.* 1879 (1949), defined probable cause as follows: "Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Id.* at 175–76, 69 *S.Ct.* at 1310–11, 93 *L.Ed.* at 1890 (quoting *Carroll v. United States,* 267 *U.S.* 132, 162, 45 *S.Ct.* 280, 288, 69 *L.Ed.* 543 (1925)). When determining whether probable cause exists, courts must consider the totality of the circumstances, and they must deal with probabilities. *Illinois v. Gates,* 462 *U.S.* 213, 230–31, 238, 103 *S.Ct.* 2317, 2328, 2332, 76 *L.Ed.*2d 527, 543–44 (1983); *see also State v. Novembrino,* 105 *N.J.* 95, 122, 519 *A.*2d 820 (1987) (adopting totality-of-the-circumstances test). That standard is required because probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra,* 462 *U.S.* at 232, 103 *S.Ct.* at 2329, 76 *L.Ed.*2d at 544; *see also Brinegar, supra,* 338 *U.S.* at 176, 69 *S.Ct.* at 1311, 93 *L.Ed.* at 1891 (stating that probable cause is a "practical, nontechnical conception"). It is "something less than proof needed to convict and something more than a raw, unsupported suspicion." *State v. Davis,* 50 *N.J.* 16, 23, 231 *A.*2d 793 (1967), *cert. denied,* 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.*2d 852

(1968). Probable cause is a suspicion or belief that is well-grounded in facts. *Id.* at 23–24, 231 *A.2d* 793.

This Court has stated that the question whether or not probable cause exists "involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law, and indeed a value judgment which inevitably reflects the seasoning and experience of the one who judges." *State v. Funicello*, 60 *N.J.* 60, 72–73, 286 *A.2d* 55 (Weintraub, C.J., concurring), *cert. denied*, 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972).

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.
>
> [*Brinegar, supra*, 338 *U.S.* at 176, 69 *S.Ct.* at 1311, 93 *L.Ed.* at 1891.]

"[T]he common and specialized experience and work-a-day knowledge of police [officers] must be taken into account." *State v. Contursi*, 44 *N.J.* 422, 431, 209 *A.2d* 829 (1965). Based on a long line of state and federal cases, we have concluded that "under both the United States and the New Jersey Constitutions, the law of probable cause was clearly established" by January 1981. *Kirk, supra*, 109 *N.J.* at 186, 536 *A.2d* 229.

The fact that the Operation LeJeune investigation team may have obtained legal advice from a deputy attorney general concerning the existence of probable cause before applying for the arrest warrant is not dispositive of whether probable cause existed. The same is true where a judge reviews a law enforcement official's affidavit and then issues a warrant. In both instances, the officer cannot escape his or her non-delegable responsibility to make an independent assessment of whether his or her affidavit establishes probable cause. *Malley v. Briggs*, 475 *U.S.* 335, 345, 106 *S.Ct.* 1092, 1098, 89 *L.Ed.*2d 271, 281 (1986).

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a [judge], working under docket pressures, will fail to perform as a [judge] should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

[*Id.* at 345–46, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 281.]

Furthermore, as the Supreme Court stated in *United States v. Leon*, 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984), the good faith inquiry of the officer "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the [arrest] was illegal despite the [judge's] authorization." *Id.* at 922 n. 23, 104 *S.Ct.* at 3420 n. 23, 82 *L.Ed.*2d at 698 n. 23.

The affidavit executed by Simonini sought warrants for Frank Schneider, Jr. and fourteen other persons. The affidavit contained a detailed description of the facts to support probable cause to believe that numerous criminal offenses had been or were being committed. The affidavit described with particularity all of the businesses, motor vehicles, and private residences to be searched, except with respect to Frankie Schneider, Jr. Neither the affidavit nor the warrant listed his place of residence, his place of employment, or his date of birth. The only descriptive information in the warrant was the name "Frank Schneider, Jr." and a description of the hijacking, but not the hijackers. Simonini testified that he did not recall if he told the judge who issued the warrant anything beyond what he stated in the affidavit. Even if he did, nothing has been presented as a supplement to his affidavit as required by *Rule* 3:5–3(a).

Although the affidavit clearly stated that a criminal hijacking and other offenses had been committed by "Mark Joseph Valardi and Frank Schneider, Jr.," neither the affidavit nor the warrant contained any information identifying plaintiff as one of the hijackers. Probable cause requires a showing that both a crime has been, or is being committed, and that the person sought to be arrested committed the offense. When a search or seizure is made pursuant to a warrant, the probable cause determination must be made based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously. *Novembrino, supra,* 105 *N.J.* at 128, 519 *A.*2d 820; *State v.*

*Howery,* 80 *N.J.* 563, 567, 404 *A.2d* 632, *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.2d* 424 (1979); *State v. Fariello,* 71 *N.J.* 552, 562–64, 366 *A.2d* 1313 (1976); *State v. Meighan,* 173 *N.J.Super.* 440, 448–49, 414 *A.2d* 576 (App.Div.), *certif. denied,* 85 *N.J.* 122, 425 *A.2d* 280 (1980). Simonini's affidavit was not supplemented at the time the warrant was issued.

Facially, the affidavit and arrest warrant for hijacker Frank Schneider, Jr. contained no details identifying plaintiff as one of the hijackers. Moreover, the description that Simonini received about the hijacker did not fit the description of plaintiff. DeBellis's informant described the hijacker as a "big kid" in his twenties with a criminal record and a muscular build who lived in the Garfield–Lodi area. Glidden, the driver of the hijacked truck, described hijacker Frank Schneider, Jr. as a very strong Hispanic male about 5'11" tall. However, the description Simonini obtained from the DMV records was of a Frank Schneider who was 6'3" and weighed only 150 lbs. Plaintiff, being "skinny as a rail," clearly did not match the description given by either DeBellis's informant or Glidden, both of whom described the culprit to be a big, strong man. Significantly, none of that information was incorporated into the affidavit or otherwise placed before the judge who issued the warrant. In addition, Simonini never verified Frank Schneider's identity with a photograph. No one ever made a positive identification of the plaintiff.

█ As we have stated in the past, probable cause is "something more than a raw, unsupported suspicion." *State v. Davis,* 50 *N.J.* 16, 23, 231 *A.2d* 793 (1967), *cert. denied,* 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.2d* 852 (1968). Law enforcement officials are required to conduct corroborative investigations when an informant's information is lacking in essential detail. *State v. Smith,* 155 *N.J.* 83, 95–96, 713 *A.2d* 1033 (1998). The lack of detail in this affidavit and warrant militates against the existence of probable cause because it prevented the judge who issued the warrant from fulfilling his obligation to make an independent determination of

whether plaintiff was the likely hijacker. *Dumbra v. United States* 268 *U.S.* 435, 441, 45 *S.Ct.* 546, 548–49, 69 *L.Ed.* 1032, 1036 (1925); *Novembrino, supra,* 105 *N.J.* at 128, 519 *A.*2d 820; *State v. Fariello,* 71 *N.J.* 552, 553, 366 *A.*2d 1313 (1976). The judge was unable to make that determination because the affidavit did not contain any objectively reasonable basis for believing that plaintiff was one of the hijackers authorized by the warrant to be arrested.

Given that neither Simonini nor Buccino had ever seen the hijacker before plaintiff was arrested, they were not able to identify Schneider based on the content of the affidavit. The name "Frankie Schneider, Jr." or "Frank Schneider, Jr." was the only description of plaintiff in the affidavit as one of the hijackers. The affidavit did not contain any other descriptive characteristics of plaintiff as the wanted hijacker. "Such a minimal description in this constitutional context is descriptive of nothing." *State v. Caldwell,* 158 *N.J.* 452, 468, 730 *A.*2d 352 (1999) (Handler, J., concurring). That critical deficiency in the affidavit, as a matter of law, prevented it from passing constitutional muster in that it "did not provide the issuing judge with sufficient facts on which to base an independent determination as to the existence of probable cause" to believe plaintiff was one of the hijackers. *Novembrino, supra,* 105 *N.J.* at 128, 519 *A.*2d 820. Although affidavits need not be teeming with detail, the affidavit here did not satisfy the Fourth Amendment's particularity requirement. *See Maryland v. Garrison,* 480 *U.S.* 79, 91, 107 *S.Ct.* 1013, 1020, 94 *L.Ed.*2d 72 (1987); *Henry v. United States,* 361 *U.S.* 98, 100–01, 80 *S.Ct.* 168, 170–71, 4 *L.Ed.*2d 134, 137–38 (1959). Consequently, the trial court was able to decide, as a matter of law, that probable cause did not exist to arrest plaintiff.

## IV.

Having found that probable cause did not exist to arrest plaintiff, we must now determine whether, under the circumstances, a reasonable police officer could have believed that probable cause existed. That is a standard of objective reasonableness, which is a lesser standard than required for probable cause. *Kirk, supra,*

109 *N.J.* at 184, 536 *A.*2d 229. The only time that standard is not satisfied is when, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue...." *Malley, supra,* 475 *U.S.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278. Unlike the majority, *post* at 380–85, 749 *A.*2d at 360–63, three members of the Court are persuaded that that standard was not satisfied in this case and defendant Simonini, as a matter of law, is not entitled to qualified immunity.

The question whether Simonini, under an objective standard, reasonably, though mistakenly, relied on the existence of probable cause is intertwined with the probable cause issue. Both require application of the objective reasonableness standard of the Fourth Amendment without regard to the law enforcement officer's underlying motive or intent. *Harlow, supra,* 457 *U.S.* at 817, 102 *S.Ct.* at 2737, 73 *L.Ed.*2d at 410; *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983). Stated differently, the question is whether Simonini, who obtained the warrant based on his objectively unreasonable affidavit that led to plaintiff's unconstitutional seizure, could nonetheless objectively and reasonably rely on the existence of probable cause. That sounds incongruous, and under the facts of this case, is incongruous.

Defendants make two allegations that they believe prove that it was objectively reasonable to rely on the existence of probable cause. Defendants first claim that they needed to act quickly due to an impending robbery, and second, they feared jeopardizing the investigation if other law enforcement agencies were contacted to get more information on Frank Schneider, Jr.'s father. Both allegations have no bearing on the question of objective reasonableness; instead, they relate to the officer's absence of bad faith, which has not been a factor bearing on immunity since *Harlow* was decided in 1982. Nonetheless, defendants also claim that the impending residential robbery and the fear of compromising the investigation excused further inquiry concerning Schneider's identity. That defense essentially raises the question whether exigent

circumstances existed, and as framed by the *Hunter* Court, "whether the [law enforcement officials] acted reasonably under settled law in the circumstances." *Hunter, supra,* 502 *U.S.* at 228, 112 *S.Ct.* at 537, 116 *L.Ed.*2d 589.

We are satisfied that exigent circumstances under the Fourth Amendment were clearly established law at the time of plaintiff's arrest, and none existed that were sufficient to satisfy the reasonableness standard. *Sharrar, supra,* 128 *F.*3d at 829. The concept of exigent circumstances is used to excuse the failure to obtain a written warrant, rather than excuse the probable cause requirement essential to support issuance of a warrant. *R.* 3:5–3(b). *Welsh v. Wisconsin,* 466 *U.S.* 740, 753, 104 *S.Ct.* 2091, 2099, 80 *L.Ed.*2d 732, 745 (1984); *United States v. Place,* 462 *U.S.* 696, 701, 103 *S.Ct.* 2637, 2641, 77 *L.Ed.*2d 110 (1983); *Payton v. New York,* 445 *U.S.* 573, 588–89, 100 *S.Ct.* 1371, 1381, 63 *L.Ed.*2d 639 (1980); *McDonald v. United States,* 335 *U.S.* 451, 455–56, 69 *S.Ct.* 191, 192–93, 93 *L.Ed.* 153 (1948); *State v. Bolte,* 115 *N.J.* 579, 597–98, 560 *A.*2d 644, *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989). Simonini's judgment concerning when to close the trap on the hijackers is not relevant to the reasonableness of his belief in the existence of probable cause.

Any competent police officer is aware of the grave consequences that flow from a misidentification of the wrong person as the perpetrator of an offense. *Simmons v. United States,* 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247 (1968). Once the DMV records revealed four entries under the name Frank Schneider who could have been one of the hijackers, any competent police officer would have proceeded with heightened caution to avoid a misidentification based solely on coincidental similarity of names. Viewed objectively, Simonini knew that in failing to tell the judge who issued the warrant any identifying information except plaintiff's name, there was a substantial probability of misidentification given the information in the DMV records.

Defendants' reliance on *Kirk* to support their claim that the circumstances made further investigation unnecessary is mis-

placed. In *Kirk*, Virginia Cardillo, a detective with the Youth Aid Bureau, was investigating the scalding of a three-year-old child. 109 *N.J.* at 176, 536 *A.*2d 229. After reviewing the Division of Youth and Family Services (DYFS) file, Cardillo learned that the child lived with her mother and the plaintiff, and that the caseworker and the treating physician thought the burns were of "questionable origin." *Ibid.*. The plaintiff met "with Cardillo, [who] waived his *Miranda* rights, and signed an exculpatory statement, in which he asserted that the scalding resulted from the breaking of a bathroom sink pipe." *Id.* at 176–77, 536 *A.*2d 229. The plaintiff agreed to take a polygraph test, but because no operator was available, the test was postponed. *Id.* at 177, 536 *A.*2d 229. When plaintiff failed to appear for the test, Cardillo spoke to an Essex County Assistant Prosecutor who told her that she had probable cause to seek the arrest of the plaintiff on aggravated assault charges. *Ibid.* Plaintiff was arrested. *Ibid.* Cardillo then requested a more detailed report from the treating physician who confirmed that the scalding was accidental in nature. *Ibid.* Soon after plaintiff was released, he filed a Section 1983 claim against Cardillo. *Ibid.*

The Court, in concluding that Cardillo was entitled to qualified immunity as a matter of law, emphasized the fact that Cardillo's investigation was "focused on the possibility of the scalding of a three-year-old child by a man living with the child's mother." *Id.* at 187, 536 *A.*2d 229. Although the Court stated that an officer who reasonably believes she has probable cause need not exercise due diligence before effecting an arrest, it is clear that the potential for further child abuse was a substantial factor in the Court's decision.

Defendants ignore the standard we adopted in *Kirk:*

Thus the question becomes whether a reasonably well-trained officer in [the state law enforcement official's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. [I]f such was the case, *the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.*

[*Kirk, supra,* 109 *N.J.* at 182, 536 *A.*2d 229 (emphasis added) (internal citation omitted) ].

We agree with the appellate court of Tennessee that:

It is the duty of the person making an arrest to take precaution against arresting an innocent person, and this require[s] the making of such investigation as the circumstances permit. The circumstances under which he must act should be such as any reasonable person acting without passion or prejudice, would have fairly suspected that the plaintiff committed the crime or was implicated in it.

[*Woods v. Harrell,* 596 *S.W.*2d 92, 96 (Tenn.Ct.App.1979) ].

Here, it was premature to apply for a warrant to arrest plaintiff before pursuing further investigative tools to better ascertain the identity of Frank Schneider, Jr., the hijacker. "Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent." *Malley, supra,* 475 *U.S.* at 343–44, 106 *S.Ct.* at 1097, 89 *L.Ed.*2d 271. That is precisely what happened in the present case.

Although the issuance of the warrant may be sufficient to prevent Simonini's conduct toward plaintiff from equating with insolence in office, *State v. Kasabucki,* 52 *N.J.* 110, 115, 244 *A.*2d 101 (1968), an application for a warrant that "is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will [lose] the shield of immunity." *Malley, supra,* 475 *U.S.* at 344–45, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d 271 (citation omitted). In the present case, the affidavit for the warrant and the warrant itself do not facially demonstrate probable cause to believe plaintiff was one of the two hijackers.

There was no objective or reliable evidence of a linkage between the plaintiff and the crime, except for the misfortune of having the same name as the real hijacker. No positive identification was made; nor was his identity even potentially confirmed through photographs. Simonini was essentially acting on a hunch. Viewing all the evidence in a light most favorable to defendants, we conclude, as a matter of law, there was no objective basis upon which a reasonably competent police officer would have believed that probable cause existed. We are therefore persuaded that any

competent law enforcement official "would have known that his affidavit failed to establish probable cause [that plaintiff was one of the hijackers] and that he should not have applied for the warrant. [Because] such was the case, [Simonini's] application for the warrant was not objectively reasonable because it created the unnecessary danger of an unlawful arrest." *Kirk supra,* 109 *N.J.* at 182, 536 *A.*2d 229. Hence, there is no qualified immunity for defendant Simonini.

## V.

Next, we must decide whether Buccino incurred any liability based on his status as Simonini's street-level supervisor. Before addressing that issue, however, we must determine the appropriate standard for assessing street-level supervisory liability in Section 1983 cases. The United States Supreme Court has directly focused on this issue only once, in *Rizzo v. Goode,* 423 *U.S.* 362, 96 *S.Ct.* 598, 46 *L.Ed.*2d 561 (1976). In a limited discussion of the issue, the Court observed that "there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [the supervisors]—express or otherwise—showing their authorization or approval of such misconduct." *Id.* at 371, 96 *S.Ct.* at 604, 46 *L.Ed.*2d 561. Although the plaintiff in that case established that at least some of the police officers on the streets had mistreated minority citizens in violation of the Constitution, the Court found that supervisory employees would not incur liability, even if a pattern of misconduct was established, unless the supervisors were causally linked to it. *Id.* at 375, 96 *S.Ct.* at 606, 46 *L.Ed.*2d 561.

Two years after *Rizzo,* the Court decided *Monell v. Department of Soc. Services,* 436 *U.S.* 658, 98 *S.Ct.* 2018, 56 *L.Ed.*2d 611 (1978), which addressed the scope of municipal liability in Section 1983 cases. It held that Section 1983 does not impose liability upon municipalities for constitutional misdeeds of their employees under a *respondeat superior* theory, which would hold a municipality liable "*solely* because it employs a tortfea-

sor"—that is, one who acts in an unconstitutional manner. *Id.* at 691, 98 *S.Ct. at* 2036, 56 *L.Ed.*2d 611. A municipality can be held liable only for violations that resulted from an official municipal policy or custom. *Id.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d 611. *Monell,* however, did not address the standard for imposing individual liability upon a supervisor. As will be seen later, the Supreme Court has addressed the knowledge standard required to impose Section 1983 liability against municipalities for failure to train their employees.

Given the lack of clear guidance from the Supreme Court in *Rizzo* and *Monell,* the federal courts have not uniformly adopted a standard to be applied in Section 1983 cases involving the failure of supervisory persons to properly supervise. The real question is how egregious a "failure to supervise" must be in order to impose street-level supervisory liability under Section 1983. Most of the federal cases have rejected the earlier standard of *respondeat superior* liability for supervisors. *See,* e.g., *Palmer v. Sanderson,* 9 *F.*3d 1433, 1437–38 (9 th Cir.1993); *Baskin v. Parker,* 602 *F.*2d 1205, 1207–08 (5 th Cir.1979).

■ The prominent standard that has emerged in the federal cases has been some form of negligence, differing only in degree. That is not surprising because the Supreme Court has frequently looked to state tort law when discussing issues raised in Section 1983 cases. *Monell* identified a Section 1983 cause of action as a "constitutional tort." *Monell, supra,* 436 *U.S.* at 691, 98 *S.Ct.* at 2036, 56 *L.Ed.*2d 611. Since *Monell,* the Court has made repeated references to state tort law. *See, e.g., Wilson v. Garcia,* 471 *U.S.* 261, 276–78, 105 *S.Ct.* 1938, 1947–48, 85 *L.Ed.*2d 254 (1985) (holding state statute of limitations for personal injury tort suits are to be applied in Section 1983 cases); *Smith v. Wade,* 461 *U.S.* 30, 38–48, 103 *S.Ct.* 1625, 1631–36, 75 *L.Ed.*2d 632 (1983) (adopting tort punitive damages rules for Section 1983 cases); *Carey v. Piphus,* 435 *U.S.* 247, 258, 98 *S.Ct.* 1042, 1049, 55 *L.Ed.*2d 252 (1978) (using tort damages principles as "the appropriate starting point for the inquiry under § 1983"). One commentator has described this

trend as a shift away from "constitutional rhetoric" toward "tort rhetoric" in Section 1983 cases. Sheldon Nahmod, *Section 1983 Discourse: The Move From Constitution to Tort*, 77 *Geo. L.J.* 1719, 1719 (1989). Nonetheless, the notice provision of the New Jersey Tort Claims Act, *N.J.S.A.* 59:8–8, does not apply to Section 1983 cases. *Felder v. Casey*, 487 *U.S.* 131, 134–38, 108 *S.Ct.* 2302, 2304–07, 101 *L.Ed.*2d 123 (1988); *Fuchilla v. Layman*, 109 *N.J.* 319, 330–32, 537 *A.*2d 652, *cert. denied*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988).

The most pro-plaintiff standard is "gross negligence" that has been adopted only by the Second Circuit. *Spencer v. Doe*, 139 *F.*3d 107, 112 (2d Cir.1998); *Black v. Coughlin*, 76 *F.*3d 72, 74 (2d Cir.1996); *Wright v. Smith*, 21 *F.*3d 496, 501 (2d Cir.1994). Seven Circuits have adopted a "knowledge and acquiescence" standard, which is more favorable to defendants. *See, e.g., Robinson v. City of Pittsburgh*, 120 *F.*3d 1286, 1293 (3d Cir.1997); *Sanders v. English*, 950 *F.*2d 1152, 1159–60 (5 th Cir.1992); *Walton v. City of Southfield*, 995 *F.*2d 1331, 1340 (6 th Cir.1993); *Gentry v. Duckworth*, 65 *F.*3d 555, 561 (7 th Cir.1995); *Ripson v. Alles*, 21 *F.*3d 805, 809 (8 th Cir.1994); *Larez v. City of Los Angeles*, 946 *F.*2d 630, 646 (9 th Cir.1991); *Jojola v. Chavez*, 55 *F.*3d 488, 490 (10 th Cir.1995). "Under the knowledge and acquiescence standard, supervisors are liable if they knew of and acquiesced in the constitutional violation." Kit Kinports, *Supervisory Liability In Section 1983 Cases*, 15 *Touro L.Rev.* 1657, 1660 (1999).

A third standard, "recklessness or deliberate indifference," is applied in nine Circuits, including some that have also utilized the knowledge and acquiescence standard, and falls in between the other two standards. *See, e.g., Febus–Rodriguez v. Betancourt–Lebron*, 14 *F.*3d 87, 92 (1 st Cir.1994); *Black v. Indiana Area Sch. Dist.*, 985 *F.*2d 707, 712 (3d Cir.1993); *Shaw v. Stroud*, 13 *F.*3d 791, 799 (4 th Cir.1994); *Doe v. Taylor Indep. Sch. Dist*, 15 *F.*3d 443, 452–53 (5 th Cir.1994) (en banc); *Starzenski v. City of Elkhart*, 87 *F.*3d 872, 880 (7 th Cir.1996); *White v. Holmes*, 21 *F.*3d 277, 280 (8 th Cir.1994); *Larez v. City of Los Angeles*, 946 *F.*2d

630, 646 (9 $^{th}$ Cir.1991); *Gates v. Unified Sch. Dist. No. 449*, 996 *F.*2d 1035, 1041 (10 $^{th}$ Cir.1993); *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 *F.*3d 1176, 1192 (11 $^{th}$ Cir.1994). That "standard provides that supervisors are liable if they acted recklessly or with deliberate indifference to the plaintiff's constitutional rights." Kinports, *Supervisory Liability In Section 1983 Cases, supra*, 15 *Touro L.Rev.* at 1660.

 Consistent with the recognition that Congress intended that Section 1983 be liberally construed "to give a broad remedy for violations of federally protected civil rights," *Monell, supra*, 436 *U.S.* at 685, 98 *S.Ct.* at 2033, 56 *L.Ed.*2d 611; *see Gomez v. Toledo*, 446 *U.S.* 635, 639, 100 *S.Ct.* 1920, 1923, 64 *L.Ed.*2d 572 (1980), we believe the standard most consistent with implementing that goal is one of "recklessness or deliberate indifference." We reject the "gross negligence" standard because it would impose supervisory liability based on constructive notice that a subordinate might engage in a constitutional tort. We also reject the stricter "knowledge and acquiescence" standard because it requires proof of actual knowledge of, and acquiescence in, the constitutional violation. Although "the nonfeasor is the supervisor to whose direction misfeasor officers are committed," *Skevofilax v. Quigley*, 586 *F.Supp.* 532, 543 (D.N.J.1984), such a supervisor should not be permitted to cloak himself or herself with immunity by electing not to be informed. A requirement for actual knowledge tends to reward a supervisor for turning a blind eye or deaf ear for fear of what might be seen or heard.

 Under the intermediate standard of "recklessness or deliberate indifference" that we adopt, a plaintiff must establish "that: (1) the supervisor ... failed to supervise the subordinate official; (2) a causal link exists between the failure to ... supervise and the violation of the plaintiff's rights; and (3) the failure to ... supervise amounts to deliberate indifference" or recklessness. *Hinshaw v. Doffer*, 785 *F.*2d 1260, 1263 (5 $^{th}$ Cir.1986). The knowledge element of a plaintiff's case requires proof that the supervisor was aware of facts from which an inference could be

drawn that the subordinate was acting in an unconstitutional manner that carried a substantial risk of causing serious harm. *Canton v. Harris,* 489 *U.S.* 378, 389, 109 *S.Ct.* 1197, 1205, 103 *L.Ed.*2d 412 (1989) (holding that municipality can be liable for failure to train employees when its failure shows "a deliberate indifference to the rights of its inhabitants.")[2]; *Smith v. Brenoett-sy,* 158 *F.*3d 908, 912 (5th Cir.1998); *Black v. Indiana Area Sch. Dist.,* 985 *F.*2d 707, 712 (3d Cir.1993). In reality, the knowledge requirement is a "should have known" test.

 We agree with Professor Kinports that a court should consider five non-exclusive factors when deciding, under the "recklessness or deliberate indifference" standard, whether to impose supervisory liability: (1) whether there were any prior incidents similar to the constitutional violation alleged by the plaintiff; (2) how adequate the supervisor's response was to those prior incidents; (3) how the supervisor responded to the violation alleged by this particular plaintiff; (4) to what extent the supervisor can be said to have been a causal factor in contributing to the constitutional violation; and (5) to what extent the supervisor was aware of the constitutional misconduct. Kit Kinports, *The Buck Does Not Stop Here: Supervisory Liability in Section 1983 Cases,* 1997 *U. Ill. L.Rev.* 147, 169–184 (1997).

---

[2] The "deliberate indifference" standard often is also applied to hold prison officials liable for Eighth Amendment violations against inmates. *Farmer v. Brennan,* 511 *U.S.* 825, 828, 114 *S.Ct.* 1970, 1974, 128 *L.Ed.*2d 811 (1994). However, as Professor Kinports warns, a "deliberate indifference" standard in the Eighth Amendment context is not applicable in a Section 1983 case. Kinports, *The Buck Does Not Stop Here: Supervisory Liability in Section 1983 Cases,* 1997 *U. Ill. L.Rev.* 147, 160 (1997). The *Farmer* standard is a subjective one that holds prison officials liable "for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer, supra,* 511 *U.S.* at 847, 114 *S.Ct.* at 1984, 128 *L.Ed.*2d 811. The *Farmer* Court purposefully rejected the objective standard articulated in *Canton v. Harris,* 489 *U.S.* 378, 109 *S.Ct.* 1197, 103 *L.Ed.*2d 412 (1989), a case that addressed the scope of a city's Section 1983 liability for constitutional violations. Therefore, the "deliberate indifference" standard of *Farmer* and its progeny is inapplicable to Section 1983 cases.

We must now apply the "recklessness or deliberate indifference" standard to the present case. Ordinarily, the factfinder in a case should decide whether that required level of negligence has been established. That issue, however, may be removed from a jury as the factfinder in highly extraordinary cases in which reasonable minds could not differ. *Fluehr v. City of Cape May,* 159 *N.J.* 532, 543, 732 *A.*2d 1035 (1999). Viewing the evidence in this case in light of the principles set forth in *Brill,* we conclude, as a matter of law, that no supervisory liability should be imposed against Buccino as the supervisor of Simonini. There was no evidence that Buccino was aware of a risk that Simonini was obtaining an unconstitutional arrest warrant for plaintiff. Nor was there evidence that Buccino acted recklessly or with deliberate indifference about whether Simonini had probable cause to arrest plaintiff. Stated another way, there was no evidence probative of the five relevant factors previously enumerated. Based on the lack of evidence, we conclude, as a matter of law, that Buccino did not subject plaintiff to a deprivation of constitutional rights, or cause plaintiff to be so subjected, thereby failing to satisfy the "affirmative link" required by *Monell.*

## VI.

Finally, we note that the term "arguable probable cause," used by the Appellate Division below, does not have a meaning different from "objective reasonableness." Other courts have used the term "arguable probable cause" to describe the standard for determining whether a defendant is entitled to qualified immunity. *See, e.g., Kuehl v. Burtis,* 173 *F.*3d 646, 649–50 (8 th Cir. 1999); *Gold v. City of Miami,* 121 *F.*3d 1442, 1445 (11 th Cir.1997), *rehearing en banc denied,* 138 *F.*3d 886 (11 th Cir.), *cert. denied,* 525 *U.S.* 870, 119 *S.Ct.* 165, 142 *L.Ed.*2d 135 (1998); *Maxwell v. City of Indianapolis,* 998 *F.*2d 431, 435–36 (7 th Cir.1993). It is clear from a review of the cases that the term "arguable probable cause" has the same meaning as the term "objective reasonableness." Both terms refer to a standard that entitles a police officer

to qualified immunity if, under the known circumstances, a reasonable police officer could have believed that probable cause existed. Therefore, the Appellate Division did not err, as plaintiff claims, in using an "arguable probable cause" standard to determine if defendants were entitled to qualified immunity. However, because the term can be confusing, we decline to adopt the term "arguable probable cause." The standard for determining qualified immunity in New Jersey is objective reasonableness.

## VII.

We conclude that probable cause did not exist to issue the warrant. A majority of the Court also concludes that in the absence of probable cause, Simonini could reasonably have believed in its existence under an objective reasonableness standard. Three members of the Court disagree with that conclusion. We also find that Buccino did not act with recklessness or deliberate indifference in his supervision of Simonini. Hence, we affirm the judgment of the Appellate Division.

VERNIERO, J., concurring in part and dissenting in part.

I concur in the majority's formulation of procedures to be used in deciding the issue of qualified immunity in actions brought under 42 *U.S.C.A.* § 1983 (Section 1983). I refer specifically to the Court's approach in respect of disputed material facts; that approach is sound and resolves a question confronted by other jurisdictions.

With regard to defendant Simonini, I conclude that he is entitled to qualified immunity under the "reasonable belief" prong of the federal test as applied in *Kirk v. City of Newark,* 109 *N.J.* 173, 536 *A.2d* 229 (1988), and other cases. Defendant acted upon the advice of counsel in the context of information obtained by two informants that prompted a series of steps designed to verify the true identity of the suspect. Although ultimately incorrect, Simonini's judgments and beliefs were reasonable at the time. Accordingly, I find Simonini to be immune for the reasons set

forth in Section II below, which is joined by three other members of the Court.

I would also find defendant Buccino to be immune. However, I dissent from that portion of the Court's opinion pertaining to that defendant. In my view, it is unnecessary to create a new standard for supervisory liability to dispose of the pertinent issues in this case. Instead, I would find Buccino to be immune on the facts presented and as a logical consequence of the majority's conclusions regarding Simonini.

I.

As part of an undercover investigation of organized crime known as Operation LeJeune, Donald Simonini, an investigator at the New Jersey Division of Criminal Justice (DCJ), received information that one "Frank Schneider" had been involved in a tractor-trailer hijacking. Simonini obtained that information from two independent sources: first in April 1989 from Anthony Bonura, DCJ's confidential informant, and then in July 1989 from an FBI informant as communicated by FBI Special Agent Robert DeBellis. Agent DeBellis characterized the suspect as "a big kid from the Lodi–Garfield area [,] . . . in his twenties [,] . . . six foot or over [with] prior involvement with the law." DeBellis also gave Simonini information contained in a State Police report prepared at the time of the crime, December 27, 1988. The report confirmed that there had been a hijacking on or about that date and contained other details.

Simonini asked DeBellis whether the FBI informant had photographs of Schneider or Mark Vilardi, the other person suspected in the hijacking, and whether the informant could otherwise be of assistance in identifying those men. DeBellis indicated that the informant could not assist with additional information but nonetheless represented to Simonini that the informant had proven to be reliable to the FBI in the past. (Indeed, the informant's description of details of the crime were verified by the victim and the police reports.)

After receiving that information and reviewing the State Police report, Simonini asked detectives at the State Police whether the driver of the hijacked tractor-trailer, Clifford Glidden, might be of assistance in identifying the perpetrators. Simonini was told that the driver probably would be of no assistance because of his likely faulty memory caused by fear at the time of the incident and the difficulty in contacting him. (Glidden was asked to assist sometime later, after plaintiff's arrest and release. Although he selected the correct Frank Schneider from a line-up of photographs, Glidden was unable to state definitively that the selected photograph was that of the person who had committed the crime.)

Armed with the information obtained through DeBellis, the FBI informant and DCJ's informant, along with the information found in the State Police report, Simonini set about the task of identifying the suspect. Utilizing a Division of Motor Vehicle (DMV) database, criminal history and similar databases, Simonini narrowed the search to four "Frank Schneiders." One of the Frank Schneiders was born in 1944, which would have made him forty-five years old and therefore too old; another lived in Lincoln Park, was born in 1964 but had a height of only five feet, eight inches, which would not have qualified as a "big kid."

The remaining two Frank Schneiders did appear to qualify on the criteria of height, age and location. Frank J. Schneider of Lodi was shown in the DMV database to have a birth date of "August 00, 1961," with an eye color of brown, while Frank J. Schneider of Hasbrouck Heights was shown to have a birth date of "August 2, 1961" and an eye color of hazel. The birth dates raised suspicions. As Simonini later explained:

> This is the type of thing that people will do when applying for a driver's license, to alter the number [specifying eye color], so that they can obtain another license under another number, and it's not detected that they are, in fact, one person with two driver's license numbers.

Because of the similarity of birth dates, Simonini concluded that the two Frank J. Schneiders were one and the same person.

Simonini then obtained the State Police master name index indicating that the individual identified with the August 2nd birth

date had a total of four arrests, including arrests for invasion of privacy, disturbance of the peace, burglary and damage to property. That information corroborated what was learned earlier from FBI Agent DeBellis, namely, that Frank Schneider the hijacker had some prior involvement with the law. Simonini contacted DeBellis again to ascertain whether he had any additional identifiers for Frank Schneider; DeBellis responded that he did not.

Fearing that he might compromise the investigation or endanger the life of the informant, Simonini made no further inquiry and concluded his investigation. Operation LeJeune itself was terminated on July 17, 1989, because the authorities believed a residential armed robbery was imminent. Before the last date of the operation, Simonini reviewed the information he had obtained concerning Schneider and Vilardi, the other suspected ·hijacker, with the legal staff at the DCJ. The deputy attorney general assigned to the investigation agreed that Simonini had probable cause to include references to both Schneider and Vilardi in his lengthy affidavit, which sought arrest and search warrants for plaintiff, Vilardi, and thirteen others who were targets of Operation LeJeune. With regard to Schneider, Simonini's affidavit detailed in pertinent part the information obtained by the two informants as corroborated by the State Police report. A judge signed the arrest warrants for plaintiff and the other suspects on July 14, 1989.

Vilardi was in the room at the armory immediately following the arrest and informed DCJ personnel that plaintiff was not the right suspect. Plaintiff was promptly released and driven back to work. Two days later, on July 19, 1989, then-Attorney General Peter N. Perretti issued a press release indicating that plaintiff was mistakenly identified as one of the individuals targeted in Operation LeJeune and that he was released two hours after his arrest. The statement also indicated that plaintiff was not involved in the Bruno/Scarfo crime family and that the authorities were still searching for the Frank Schneider, Jr. who was the actual target of the investigation. In addition, an assistant attorney general

sent plaintiff a letter indicating that the press release had been sent to various newspapers and news services to lessen any negative impact resulting from plaintiff's arrest and brief detention. The Attorney General's Office also offered to write to plaintiff's employer to verify that plaintiff's arrest was a mistake.

On August 3, 1989, the Frank J. Schneider involved in the hijacking turned himself in to authorities. In fact, that Frank Schneider was the same person Simonini had found in the DMV records with the Lincoln Park address and the 1964 birth date. Plaintiffs' suit and this appeal followed.

## II.

"The existence of probable cause is a complete defense to a [Section] 1983 claim . . . ." *Bernstein v. Aivazis,* 584 *F.Supp.* 606, 607 (D.N.J.1983). If, in hindsight, it is determined that probable cause did not exist, an officer will still be immune from suit if "a reasonable police officer could have believed in its [probable cause] existence." *Kirk v. City of Newark, supra,* 109 *N.J.* at 184, 536 *A.*2d 229.

The United States Supreme Court has made clear that, in close cases in which reasonable minds may differ about whether probable cause existed to justify an arrest, the officer should be immune, stating: "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 *U.S.* 335, 341, 106 *S.Ct.* 1092, 1096, 89 *L.Ed.*2d 271, 278 (1986). Thus, the qualified immunity standard is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Ibid.*

Probable cause as a legal standard is, by design, inexact.

In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

[*Brinegar v. United States,* 338 *U.S.* 160, 175, 69 *S.Ct.* 1302, 1310, 93 *L.Ed.* 1879, 1890 (1949).]

At its root, the doctrine of probable cause represents society's attempt at striking a balance between safeguarding citizens from the unreasonable actions of police officers and providing those same officers with the leeway necessary to enforce the law for everyone's protection. "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests." *Id.* at 176, 69 *S.Ct.* at 1311, 93 *L.Ed.* at 1891.

In this case, Simonini secured the following evidence or information upon which to base his actions: the taped conversation between the DCJ informant, Anthony Bonura, and an Operation LeJeune target, Richard Discorfano, in which it was revealed that a "Frankie Schneider" was involved in the truck hijackings; the statement by FBI Special Agent DeBellis that a second informant, an FBI informant, indicated that a Frank Schneider, Jr. had committed the hijacking; the fact that plaintiff's address, age, height and criminal record were consistent with the FBI informant's description of Frank Schneider, Jr.; the fact that DeBellis told Simonini that the FBI informant had proven to be reliable in the past; and the fact that the details of the crime given by the federal informant were consistent with the victim's version of events and the version found in the investigative police reports.

■ Even if we assume that the foregoing did not give rise to actual probable cause, the inquiry does not end there. As noted, even if a law enforcement officer's judgments and beliefs turn out to be erroneous, that officer is still protected by qualified immunity if those judgments and beliefs were reasonable under the circumstances. "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they feared being sued." *Hunter v. Bryant,* 502 *U.S.* 224, 229, 112 *S.Ct.* 534, 537, 116 *L.Ed.*2d 589, 596 (1991) (quoting *Davis v. Scherer,* 468 *U.S.* 183, 196, 104 *S.Ct.* 3012, 3020, 82 *L.Ed.*2d 139, 150–51 (1984)). I agree with the conclusion of the Appellate Division that Simonini satisfied this second prong of the analysis. As Judge Collester stated for the unanimous panel:

Information received and developed by Simonini in this case gave him a reasonable objective belief in the existence of probable cause that plaintiff was one of the hijackers. The recorded conversation between Bonura and Discorfano spoke of a botched hijacking involving "Frankie Schneider." The information received from DeBellis' informant named one of the perpetrators as a Frank Schneider, Jr. and described him as a "big kid" in his twenties with a criminal record who lived in the Garfield and Lodi area. Simonini was entitled to rely on the information supplied by an FBI informant described as reliable, and in fact the informant's description of the details of the crime were verified by the victim and the investigative police reports. *See State v. Novembrino,* 105 *N.J.* 95, 120–22, 519 *A.*2d 820 (1987). Moreover, Simonini's investigation of relevant records confirmed that plaintiff's appearance, address and criminal history were consistent with the other information supplied as to one of the hijackers. *See United States v. Williams,* 10 *F.*3d 1070, 1075 n. 6 (4th Cir.1993), *cert. denied,* 513 *U.S.* 926, 115 *S.Ct.* 313, 130 *L.Ed.*2d 276 (1994); *Powe v. City of Chicago,* 664 *F.*2d 639, 645 (7th Cir.1981).

[*Schneider v. Simonini,* 314 *N.J.Super.* 583, 594–95, 715 *A.*2d 1018 (App.Div. 1998).]

Using twenty-twenty hindsight, three members of the Court assert that Simonini should have taken other steps to ensure certainty in the identification of the suspect, Frank Schneider, Jr. However, the test for qualified immunity does not require certainty or even actual probable cause, but only that the officer's belief in probable cause be reasonable. *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229; *Lee v. Sandberg,* 136 *F.*3d 94, 102–03 (2d. Cir.1997); *Madiwale v. Savaiko,* 117 *F.*3d 1321, 1324 (11th Cir.1997); *Johnson v. Schneiderheinz,* 102 *F.*3d 340, 341 (8th Cir.1996).

It bears repeating that, "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley, supra,* 475 *U.S.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278. "Even plaintiffs' expert did not testify that no reasonable police officer would conclude that an arrest warrant could issue under the circumstances or that officers of reasonable competence could not disagree on the issue of probable cause for a warrant." *Schneider v. Simonini, supra,* 314 *N.J.Super.* at 595, 715 *A.*2d 1018. Because at the very least there was a reasonable belief in probable cause, Simonini is entitled to qualified immunity for his conduct.

The fact that Simonini may have lacked actual probable cause does not, and under federal case law cannot, deprive him of immunity so long as his belief in the existence of probable cause was reasonable under the "reasonable belief" prong of the analysis. The trial court opinion mistakenly forecloses that second, distinct ground for immunity. As the trial court observed:

Well, you know, it's almost inconceivable that I could find both that there was no probable cause with respect to [Simonini] and that there was a qualified immunity because it is essentially a review and critique of his behavior which has induced me to conclude that there was no probable cause.

Similarly, three members of the Court believe, "the question is whether Simonini, who obtained the warrant based on his objectively unreasonable affidavit that led to plaintiff's unconstitutional seizure, could nonetheless objectively and reasonably rely on the existence of probable cause. That sounds incongruous, and under the facts of this case, is incongruous." *Ante* at 366, 749 *A.*2d at 352.

In my view, however, it is not incongruous to note that Simonini reasonably may have believed that he had probable cause even if, in fact, he did not. That Simonini may have omitted additional details from the affidavit does not mean that he believed less strongly or reasonably in the existence of probable cause. The asserted defects in the application do not, without more, foreclose the possibility that defendant maintained a reasonable but mistaken belief in probable cause.

Moreover, although Simonini's affidavit may have been insufficient to sustain a finding of actual probable cause, it was not so deficient as to render any officer's belief in the existence of probable cause unreasonable for purposes of Section 1983 immunity. As the Appellate Division concluded: "[Simonini's] application for the arrest warrant was not 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable' ...." *Schneider v. Simonini, supra,* 314 *N.J.Super.* at 596, 715 *A.*2d 1018 (quoting *Malley, supra,* 475 *U.S.* at 344–45, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 281).

I find no evidence in the record to support the conclusion that "Simonini knew that in failing to tell the judge who issued the warrant any identifying information except plaintiff's name, there was a substantial probability of misidentification given the information in the DMV records." *Ante* at 367, 749 *A.*2d at 353. In my view, one may arrive at such a conclusion only by delving into Simonini's state of mind. If such a determination is truly needed to dispose of this appeal (I believe it is not), it would appear to be a question for the jury to resolve.

As indicated in the record, Simonini methodically engaged in a process of elimination before including plaintiff's name in the warrant application. In so doing, Simonini appeared to be making reasonable judgments. For example, when presented with a choice between a Frank Schneider that may have been the right height but not the right weight, and one who was about the right weight but not the right height, Simonini selected the Frank Schneider who was the right height. That was a reasonable approach considering that height is more or less a fixed variable, whereas the weight of an individual can fluctuate. Simonini did more than "act[ ] on a hunch," *ante* at 369, 749 *A.*2d at 354; he made a diligent effort to accurately identify the suspect.

Additionally, the process employed by Simonini yielded an initial pool of only four persons, one of whom was, in fact, the correct Frank Schneider. It is significant that Simonini acted upon the advice of a deputy attorney general in making his probable cause determination. In *Kirk*, the fact that the police officer acted upon the advice of an assistant prosecutor was considered by this Court to be one of two factors requiring a finding of immunity, the other being the fact that a child might have been in physical danger in that case. As we noted: "[The officer] was confronted with a possible case of child abuse and acted on the advice of counsel. Consequently, we find that a reasonably well-trained police officer viewing the facts could have believed that she had probable cause

to arrest defendant." *Kirk, supra,* 109 *N.J.* at 187, 536 *A.*2d 229 (citations omitted).

An investigation like Operation LeJeune presents special risks and therefore poses a unique context within which to judge the reasonableness of police actions. No one can deny the pernicious effects of organized crime: it saps the energy and resources of law enforcement, taints the honest marketplace by fostering an underground economy, and—literally—puts lives in danger. As Simonini himself stated:

> If anything ever happened down the line, where this informant was killed or hurt [or] threatened ... in some way anyone who has knowledge of this informant could be questioned as to, you know, were you responsible for what happened to this informant?

Although not excusing the probable cause requirement, Simonini's concern for the safety of the informant does help to explain how defendant reasonably might have concluded that the circumstances required him to forego additional investigation before making the arrest. As noted, the emergency-like circumstances evident in *Kirk* formed the basis of our granting immunity in that case. *See also Anderson v. Creighton,* 483 *U.S.* 635, 641, 107 *S.Ct.* 3034, 3039–40, 97 *L.Ed.*2d 523, 531 (1987) (explaining how reasonable but mistaken judgments about exigency are similarly protected by immunity).

"The Supreme Court created the qualified immunity defense in order to protect public officials from being sued for every error in judgment, thereby diverting their attention from their public responsibilities and impeding the independent exercise of their discretion." Kit Kinports, *The Buck Does Not Stop Here: Supervisory Liability in Section 1983 Cases,* 1997 *U. Ill. L. Rev .* 147, 190 (1997). Here, Simonini acted upon the advice of counsel within the context of information obtained by two informants that set in motion a process of elimination that led to a reasonable belief, albeit a mistaken one, as to the suspect's identity. Accordingly, this case squarely highlights the purpose of an immunity defense as enunciated by the Supreme Court. *See also Hayes v. Mercer County,* 217 *N.J.Super.* 614, 526 *A.*2d 737 (App.Div.1987)

(holding investigator not liable even though he arrested wrong person).

### III.

Having found Simonini to be immune because of his reasonable belief in probable cause, I would find his supervisor, DCJ Deputy Chief Robert T. Buccino, to be similarly immune. In view of the facts presented and the majority's determination in respect of Simonini, I believe it is unnecessary for the Court to create a new standard to resolve the issue of the supervisor's liability.

Buccino was involved to the extent that he supervised the entire operation but the record does not disclose specific, personal involvement in terms of the steps taken by Simonini in respect of plaintiff's arrest. Buccino testified:

> In the case of Don Simonini, I wouldn't ask the question do you have probable cause. There is an attorney sitting right along side of him. If Don Simonini had one-year experience as a law enforcement [officer], yes, I would go up to him and say, sure let's go over your probable cause because that would be my job [if] I feel that the officer is inexperienced[,] but with the people that I have in the organized crime [agency] they're all experienced, well-trained, I don't ask those questions ....

That level of involvement is simply insufficient as a matter of law to hold Buccino liable under Section 1983. As the Appellate Division concluded, "[w]ith respect to Buccino, the rationale for qualified immunity is stronger since he committed no acts leading to plaintiff's arrest." *Schneider v. Simonini, supra,* 314 *N.J.Super.* at 595, 715 *A.*2d 1018.

The Court's approach also appears to be at odds with the one adopted by the United States District Court in *Skevofilax v. Quigley,* 586 *F.Supp.* 532, 543 (D.N.J.1984). In that case, Judge Maryanne Trump Barry, now an appellate judge on the Third Circuit Court of Appeals, observed that a supervisor "might be held liable" if the plaintiff were able to show that the supervisor "was personally involved in the unlawful action or that there was some causal connection between an act of the official and the

alleged violation ...." *Ibid.* That standard appears dissimilar to the one adopted by the majority.

According to the United States Supreme Court, the final arbiter of Section 1983 actions, the qualified immunity standard is designed to provide "ample room for mistaken judgments" on the part of the police. *Malley, supra,* 475 *U.S.* at 343, 106 *S.Ct.* at 1097, 89 *L.Ed.*2d at 280. Judge Barry's formulation in respect of supervisory liability seems most consistent with the overall policy objectives set forth in *Malley.* Judge Barry's standard would appear to hold the truly culpable supervisors liable for Section 1983 offenses while providing "ample room" for errors or failures in supervisory oversight. In any event, because no new test is required on these facts, I would wait for a more appropriate case before settling on one of any number of competing federal standards.

## IV.

In sum, the evidence and information secured by Simonini provided him with a reasonable basis upon which to believe in the existence of probable cause to arrest plaintiff. Thus, he is entitled to immunity. Under the "reasonable belief" prong of the federal test, it is not necessary for actual probable cause to have existed. Nor is it necessary to determine whether actual probable cause existed to dispose of this appeal. Buccino, a supervisor who took no action specific to plaintiff, should be immune as a logical consequence of Simonini's immunity. The special risks posed by Operation LeJeune provide a context that helps to explain the reasonableness of what occurred in this case.

We must abide by the instruction of the United States Supreme Court and provide the police with "ample room for mistaken judgments ...." *Malley, supra,* 475 *U.S.* at 343, 106 *S.Ct.* at 1097, 89 *L.Ed.*2d at 280. In so doing, we ensure the protections of law enforcement necessary for the safety and well-being of the entire community. There are clear instances in which police officers

should stand trial because of serious misconduct. This is not one of them.

## V.

For the reasons stated, I would affirm the judgment of the Appellate Division.

*For affirmance in Sections II, VI, and VII*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*For affirmance in Sections III and V*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN and LONG—6.

*Concur in part; dissent in part in Sections III and V*—Justice VERNIERO—1.

*For affirmance in Section IV*—Chief Justice PORITZ and Justices GARIBALDI, LONG and VERNIERO—4.

*For reversal in Section IV*—Justices O'HERN, STEIN and COLEMAN—3.