NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5772-14T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,
v.

VASILIO KOUTSOGIANNIS, a/k/a
VASILIO KOUTSGIANNIS,

 Defendant-Appellant.

 Submitted May 10, 2017 – Decided June 8, 2017

 Before Judges Simonelli, Carroll and Gooden
 Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Ocean County, Indictment
 No. 13-07-1902.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (David A. Gies, Designated
 Counsel, on the briefs).

 Joseph D. Coronato, Ocean County Prosecutor,
 attorney for respondent (Samuel Marzarella,
 Chief Appellate Attorney, of counsel; William
 Kyle Meighan, Senior Assistant Prosecutor, on
 the brief).

 Appellant filed a pro se supplemental brief.
PER CURIAM

 In this appeal, defendant Vasilio Koutsogiannis challenges

the denial of his motion to suppress, as unconstitutional, his

arrest, his custodial statement, and evidence seized from his

parents' home where he was temporarily residing. We affirm,

substantially for the reasons expressed in Judge Francis R.

Hodgson, Jr.'s thorough written opinion of September 24, 2014.

 I.

 On March 2, 2013, T.M.1 called 9-1-1 to report he was robbed

at gunpoint. Sergeant Dennis Jarin of the Ocean Township Police

Department (OTPD) responded to the scene at approximately 5:42

p.m. T.M. told Jarin the robbery occurred while he was walking

and a passing car stopped and asked him for directions. T.M.

reported that $500 and a butane lighter were taken from him at

gunpoint by the vehicle's two occupants. T.M. supplied Jarin with

a description and license plate number of the vehicle.

Investigation revealed the car was registered to defendant's

sister, Katerina Koutsogiannis (Katerina),2 who resided on Ross

1
 We use initials for the victim to protect his privacy interests.
2
 Because defendant, his co-defendant Katerina, and other family
members who testified at the suppression hearing share a common
surname, we refer to them by their first names in this opinion for
clarity and ease of reference.

 2 A-5772-14T4
Court in Manahawkin. The description of the vehicle was broadcast

to surrounding police agencies in an attempt to locate it.

 T.M. was transported to OTPD headquarters where he was further

interviewed by Sergeant Michael Rogalski. T.M. initially reported

that the female passenger reached out of the car with a rope, tied

him around the neck, and dragged him into the car. The male driver

then shoved a handgun in his face, and the two stole $500 from him

before driving off.

 Under further questioning by Rogalski, T.M. changed his story

and admitted the robbery occurred during his sale of thirty-seven

bags of heroin to the two suspects. T.M. now stated he entered

the vehicle and met with a male driver with a goatee known as

"Vic" and a woman who sat in the back seat. The three began

discussing the drug transaction when suddenly the woman wrapped

something around his neck and the driver stuck a handgun in his

left cheek and demanded he empty his pockets. The pair allowed

T.M. to leave after he placed the heroin and his money on the

floor of the vehicle. T.M. explained that he called the police

because he feared for his safety and that of his family. During

this recorded interview, Rogalski noted redness to T.M.'s neck and

a mark on his left cheek, consistent with T.M.'s version of events.

 3 A-5772-14T4
 A short time later, officers from the Stafford Township Police

Department (STPD) located the subject vehicle on Kristine Avenue 3

in Manahawkin, one block east of the Ross Court address that

appeared on Katerina's registration. At around 6:15 p.m., STPD

Patrolman Robert Conforti, accompanied by his K-9 dog who was

trained to track the freshest odor, followed the fresh scent to

the Ross Court address to which the car was registered. Believing

the car's occupants were involved in the armed robbery and were

presently in the Ross Court home, Conforti and other officers took

positions around the outside.

 STPD Lieutenant Herman Pharo, who was in charge of the

regional S.W.A.T. unit, was called and responded to the scene.

Pharo believed the home was occupied based on reports from other

officers that they observed movement and lights being turned on

and off inside. Pharo called the house phone and, although he

heard it ringing, no one answered. The phone was eventually

answered by Frank Koutsogiannis (Frank), the father of defendant

and Katerina. Frank owned the Ross Court home, and Pharo knew

Frank because he owned a local restaurant. Frank told Pharo he

was in Florida and his phone calls were being forwarded to him

there. Frank advised Pharo that defendant was staying in the

3
 Kristine Avenue alternately appears as Christine Avenue in the
record.

 4 A-5772-14T4
house, and that the only other person who had access to it was

Katerina. Pharo informed Frank that defendant and Katerina were

suspects in an armed robbery. According to Pharo, Frank then gave

permission for police to enter the home, and indicated he would

send his older daughter Sophia with a key.

 Sophia arrived about fifteen minutes later. She testified

at the hearing: "My father called me, he was in Florida. He said

to go to . . . my parents' house, to let the police in, because

they were looking for [defendant and Katerina]." Although Sophia

claimed she had a key, she was met by Pharo who kept her away from

the house and, consequently, she did not use the key to enter.

 The ensuing events are recounted in Judge Hodgson's written

opinion as follows:

 Pharo continued his attempts to make
 contact with the occupants of the house. He
 walked to the front door and knocked and
 identified himself as police and called out
 to occupants with no response. Pharo walked
 around the back of the house and then toward
 the front again and knocked and called out as
 he proceeded [but] no one answered. As he
 continued his walk around the house the garage
 door went up. As the officers began to enter
 the garage, the door started to close. The
 entering officers triggered the infrared
 safety mechanism that stops the door from
 closing when it is blocked and the door
 reversed and continued to open. The officers
 entered the garage and partially opened the
 interior garage door leading from the garage
 into the house. Officers called out for the
 occupants and identified themselves as police,

 5 A-5772-14T4
 at this point not yet crossing the threshold
 of this interior garage door. [Defendant]
 came from inside the house to the interior
 garage door with his hands up, presenting
 himself to the officers, and was taken into
 custody. Officers then entered the house
 through the door from the attached garage and
 continued to call out. [Katerina] was located
 on the first floor at the top of the stairway
 leading to the basement walking toward the
 officers with her hands up. She complied with
 police orders to come to them. She was then
 taken into custody without incident. Both
 [Katerina] and [defendant] were brought
 outside, handcuffed, and taken away in police
 cars. The police swept the house for other
 occupants and then secured the residence while
 they sought a search warrant. Sophia was
 permitted into the house and told to wait
 until the officers returned with a search
 warrant. Police reported securing the
 residence at about 8:03 p.m.

 Defendant and Katerina were taken to police headquarters

where they were interviewed separately. Rogalski first read

Katerina her Miranda4 rights and presented her with the OTPD

standard rights form, which she signed. Katerina initially claimed

that defendant received a phone call from a friend to pick up

someone named Joey. When "Joey" entered the vehicle he appeared

beat up and stated someone had just tried to rob him. "Joey" then

"pull[ed] out a bunch of dope. Blue bags of heroin." Upon seeing

the drugs, Katerina and her brother ordered "Joey" out of the car.

4
 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d
694 (1966).

 6 A-5772-14T4
 Katerina's initial version of events changed as her

questioning progressed until eventually it coincided more closely

with that of T.M. She revealed that recently she had again been

using heroin. She stated her brother took her along for a ride

when she told him she could not lend him any money. They then

went to pick up "Joey" and, when he entered the car, defendant

pulled out a gun, pushed it into "Joey's" neck, and announced it

was a robbery. After a break in the questioning during which

police spoke to defendant, Katerina admitted she used a scarf to

hold T.M. by the neck from the back seat of the car. She further

admitted that, upon arriving back at her parents' house, she and

defendant concocted her initial version that the victim entered

the car after having already been beaten. Katerina stated that

heroin, but no cash, was taken from the victim. She also said

defendant took the gun from the car and stashed it somewhere in

the garage of the home.

 Defendant was interviewed next. He denied the robbery and

gun possession allegations after being read his Miranda rights.

Defendant told police, as Katerina initially did, that "Joey"

appeared roughed up when he entered the car and defendant ordered

him to leave after "Joey" "pull[ed] out about I don't know how

many bags [] of pot [and] maybe [thirty], [forty] bags of heroin."

When informed by police that Katerina stated otherwise, defendant

 7 A-5772-14T4
claimed his sister was in "cohoots" with T.M., and would say

anything to avoid blame. Defendant advised that Katerina parked

the car on Kristine Drive because she was not allowed in her

parents' house. Defendant further stated he heard the police

knocking and that he cooperated with them by opening the garage

door and lying down. Rogalski testified that later, as Katerina

was brought into the patrol room where defendant was being held

in a cell, defendant told her, "I can't believe you ratted out

your own brother."

 Sophia was allowed to remain in the kitchen and bathroom of

the residence while police obtained a warrant to search the home

and car. While using the bathroom, Sophia noticed the cabinet was

not closing properly. She attempted to close it and, in doing so,

found empty heroin packets and a needle, which she turned over to

the police. Following issuance of the search warrant, police

recovered a multicolored scarf from the car, and heroin and a

handgun from the garage of the home.

 In July 2013, while T.M. was incarcerated, he recanted his

prior version of events. Instead, T.M. told a defense investigator

he was not the victim of a robbery, there was no gun, and no scarf

had been placed around his neck.

 Later that month, defendant and Katerina were jointly charged

in Ocean County Indictment No. 13-07-1902 with first-degree

 8 A-5772-14T4
robbery, N.J.S.A. 2C:15-1 (count one); second-degree possession

of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count

two); third-degree unlawful possession of a weapon, N.J.S.A.

2C:39-5b (count three); and third-degree possession of a

controlled dangerous substance (CDS), N.J.S.A. 2C:35-10a(1) (count

five). Defendant was charged separately with fourth-degree

aggravated assault, N.J.S.A. 2C:12-1b(4) (count four); and second-

degree possession of a firearm by a convicted person, N.J.S.A.

2C:39-7b (count six). Katerina was separately charged in count

seven with second-degree possession of a firearm by a convicted

person, N.J.S.A. 2C:39-7b.

 Defendant and Katerina moved to suppress their arrests, their

custodial statements, and the seized evidence. The trial court

denied the motions on September 22, 2014. On February 6, 2015,

pursuant to a negotiated plea agreement, defendant pled guilty to

an amended charge of second-degree robbery, and the State agreed

to dismiss the remaining charges in Indictment No. 13-07-1902.

Defendant also reserved the right to appeal the denial of his

suppression motion and certain other designated legal issues.5

5
 Defendant also pled guilty to an unrelated third-degree
possession of CDS charge under Indictment No. 13-06-1400, for
which he received a concurrent four-year prison sentence.

 9 A-5772-14T4
 On May 15, 2015, defendant filed a pro se motion to withdraw

his plea, claiming he was not guilty of the charges in the

indictment, and that his plea was coerced and not knowingly and

intelligently entered. Defendant subsequently withdrew the motion

and proceeded to sentencing on July 31, 2015. The court imposed

a five-year prison term with an eighty-five-percent period of

parole ineligibility pursuant to the No Early Release Act, N.J.S.A.

2C:43-7.2. This appeal followed.

 II.

 In his counseled brief, defendant raises the following issues

for our consideration:

 POINT ONE

 [] DEFENDANT'S WARRANTLESS ARREST WAS
 UNCONSTITUTIONAL WHERE THE POLICE OFFICERS
 ENTERED HIS HOME WITHOUT CONSENT OR THE
 PRESENCE OF EXIGENT CIRCUMSTANCES.

 POINT TWO

 SOPHIA'S CONDUCT WHICH WAS CONTROLLED BY THE
 POLICE OFFICERS WHO ALLOWED HER TO ENTER THE
 HOME AFTER IT WAS SECURED AMOUNTED TO JOINT
 PARTICIPATION SUFFICIENT TO BRING THE PRIVATE
 PARTY'S SEIZURE OF THE EMPTY WAX FOLDS WITHIN
 THE PURVIEW OF THE EXCLUSIONARY RULE.

 POINT THREE

 THE FACTS AND CIRCUMSTANCES TO SUPPORT A WELL-
 GROUNDED SUSPICION THAT A CRIME OCCURRED IN
 ORDER TO ISSUE A SEARCH WARRANT OF []
 DEFENDANT'S HOME IS ABSENT WHERE THE POLICE
 OFFICER RELIED ON INFORMATION TOLD TO HIM BY

 10 A-5772-14T4
 ANOTHER OFFICER WHICH RESTED ON FACTS RELATED
 BY A KNOWN UNRELIABLE SOURCE WHO LATER
 RECANTED.

 POINT FOUR

 LACKING THE EXISTENCE OF A WELL-GROUNDED
 SUSPICION THAT [] DEFENDANT WAS KATERINA'S
 PARTNER IN THE ALLEGED ROBBERY, [] DEFENDANT'S
 CUSTODIAL STATEMENT SHOULD BE SUPPRESSED WHERE
 IT WAS OBTAINED AFTER AN ILLEGAL ARREST.

 POINT FIVE

 KATERINA'S CUSTODIAL STATEMENTS SHOULD BE
 SUPPRESSED WHERE HER RESPONSES SHOW THAT HER
 SUBMISSION TO THE INTERROGATION WAS NOT
 VOLUNTARY.

 The following additional points are raised in defendant's pro

se supplemental brief:

 POINT ONE

 [THE] COURT ERRED IN FINDING SUFFICIENT
 PROBABLE CAUSE EXISTED TO JUSTIFY THE
 WAR[R]ANTLESS [ARREST] OF DEFENDANT AND
 CODEFENDANT AT [THE] SUPPRESSION HEARING.

 POINT TWO

 NO VALID EXCEPTIONS TO THE WARRANT REQUIREMENT
 EXISTED TO JUSTIFY THE ENTRY INTO
 [DEFENDANT'S] HOME [] OR HIS SUBSEQUENT
 ARREST.

 POINT THREE

 STATEMENTS OBTAINED BY [THE] O.T.P.D. WERE THE
 PRODUCT OF AN UNLAWFUL ARREST AND JUDGE
 HODGSON ERRED IN NOT SUPPRESSING THEM.

 11 A-5772-14T4
 POINT FOUR

 THE PROTECTIVE SWEEP OF [DEFENDANT'S] HOME WAS
 UNLAWFUL UNDER THE [FOURTH] AMENDMENT [TO THE
 UNITED STATES CONSTITUTION] AND JUDGE HODGSON
 ERRED IN FINDING IT TO BE REASONABLE.

 POINT FIVE

 THE STATE[']S CONDUCT IN INSTIGATING FALSE AND
 FRAUDULENT AND BELATED POLICE REPORTS AND
 TESTIMONY AT [THE] SUPPRESSION HEARING
 VIOLATED [DEFENDANT'S FOURTEENTH] AMENDMENT
 DUE PROCESS RIGHTS AND PREJUDICED THE
 PROCEEDINGS. JUDGE HODGSON ERRED IN ADMITTING
 THEM.

 POINT SIX

 [DEFENDANT'S] GUILTY PLEA IS INVALID AND MUST
 BE VACATED.

 POINT SEVEN

 VINDICTIVE, MALICIOUS, AND SELECTIVE
 PROSECUTION [] PREJUDICED DEFENDANT[']S
 JUDICIAL PROCEEDINGS AND SUBSEQUENT PLEA
 AGREEMENT.

 POINT EIGHT

 [THE] PROSECUTOR FAILED TO PRESENT EXCULPATORY
 EVIDENCE TO [THE] GRAND JURY [] NEGAT[ING]
 DEFENDANT[']S GUILT THUS REQUIRING DISMISSAL
 OF IND. NO: 13-07-1902.

We consolidate defendant's arguments in the discussion that

follows.

 III.

 A.

 12 A-5772-14T4
 We first address defendant's contention that the police

lacked probable cause to arrest him. In his written opinion,

Judge Hodgson began by noting that the "threshold issue to be

addressed [] is whether the police had probable cause to arrest

defendant[]." The judge found probable cause for the arrest,

reasoning:

 In the instant case, at the time of their
 entry into the residence at Ross Court, police
 were acting on a report from an identified
 citizen who reported being robbed at gunpoint
 first by making a call to 9-1-1 and then
 providing statements to [O]fficer Jarin, the
 responding officer[,] and [D]etective
 Rogalski. The responding Stafford officers
 were entitled to rely on the underlying police
 work of other officers who were investigating
 the crime; information possessed by the 9-1-1
 dispatcher as well as [O]fficers Jarin and
 Rogalski is properly imputed to the responding
 officers. See United States v. Robinson, 535
 F.2d 1298, 1299 (9th Cir. 1976); United States
 v. Hensley, 469 U.S. 221, 230-31[, 105 S. Ct.
 675, 681-82, 83 L. Ed. 2d 604, 613-14]
 (1985); Whiteley v. Warden of Wyo. State
 Penitentiary, 401 U.S. 560, 568[, 91 S. Ct.
 1031, 1037, 28 L. Ed. 2d 306, 313] (1971).
 See also, State v. Crawley, 187 N.J. 440, 457,
 cert. denied, 549 U.S. 1078[, 127 S. Ct.
 740, 166 L. Ed. 2d 563] (2006); State v.
 Williams, 404 N.J. Super. 147, 170-71 (App.
 Div. 2008). . . . [T.M.] was able to identify
 the suspects by providing: the make and
 license plate number of the car; a description
 of the occupants; and a detailed description
 of the gun. Corroborating his report to
 police, [T.M.] had injuries consistent with
 his statement: red marks on his cheek and
 neck. In addition, police located the car on
 an adjacent street to the Koutsogiannis

 13 A-5772-14T4
 residence and were able to track the occupants
 to the house. The fact that the subject car
 was parked on an adjacent street to the
 address of the registered owner, and that a
 K-9 tracked to that residence raises
 additional support for the proposition that
 criminal activity was afoot. This apparent
 attempt at disguising their location and
 whereabouts demonstrates a consciousness of
 guilt and supports the conclusion that the
 occupants were involved in criminal activity
 and attempting to thwart law enforcement.
 This suspicion is bolstered by the fact that
 although movement was detected in the
 residence, no one answered the phone calls by
 [Lt.] Pharo or the officers knocking on the
 front door. Finally, the identification was
 corroborated by Frank identifying the
 occupants as [defendant] and Katerina,
 matching the description given by [T.M.].
 Based on the foregoing, I am satisfied that
 under the totality of the circumstances, the
 information provided by the [victim] together
 with the information learned by police through
 their investigation was clearly sufficient to
 establish probable cause to believe that
 [defendant] and Katerina had robbed T.M. at
 gun point and were located in the residence
 at Ross Court.

 Defendant disagrees and asserts that the police did not have

probable cause to arrest him. "Probable cause exists if the facts

and circumstances known to the officer warrant a prudent man in

believing that the offense has been committed." State v.

Novembrino, 105 N.J. 95, 106 (1987) (quoting Henry v. United

States, 361 U.S. 98, 100-02, 80 S. Ct. 168, 170-71, 4 L. Ed. 2d

134, 137-38 (1959)). Furthermore, "[w]hen determining whether

probable cause exists, courts must consider the totality of the

 14 A-5772-14T4
circumstances[.]" Schneider v. Simonini, 163 N.J. 336, 361 (2000)

(citing Illinois v. Gates, 462 U.S. 213, 230-31, 238, 103 S. Ct.

2317, 2328, 2332, 76 L. Ed. 2d 527, 543-44 (1983); Novembrino,

supra, 105 N.J. at 122), cert. denied, 531 U.S. 1146, 121 S. Ct.

1083, 148 L. Ed. 2d 959 (2001).

 Our Supreme Court has noted that an ordinary citizen reporting

crime to the police is not viewed with suspicion. See State v.

Amelio, 197 N.J. 207, 212 (2008), cert. denied, 556 U.S. 1237, 129

S. Ct. 2402, 173 L. Ed. 2d 1297 (2009). "There is an assumption

grounded in common experience that such a person is motivated by

factors that are consistent with law enforcement goals." State

v. Davis, 104 N.J. 490, 506 (1986).

 Here, the police received a report from an identified citizen,

T.M., regarding criminal activity at a specific location. The

information T.M. provided was immediately corroborated by Sgt.

Rogalski's observation of marks on T.M.'s face and neck that were

consistent with T.M.'s report that he was the victim of an armed

robbery. T.M. provided a description of the male and female

suspects and the vehicle involved, including its license plate

number. Viewing the totality of the circumstances, we agree with

Judge Hodgson that the information provided by T.M., along with

that developed through further police investigation, was

sufficient to establish probable cause to believe that defendant

 15 A-5772-14T4
and Katerina robbed T.M. at gun point and were located in the Ross

Court residence.

 B.

 Defendant argues that the warrantless entry of the residence

by police was unlawful. In addressing this issue, Judge Hodgson

observed that, while there was probable cause to arrest defendant,

"it is well settled that police could not lawfully enter the

residence without either an arrest or a search warrant or,

alternatively, a recognized exception to the warrant requirement

of the Fourth Amendment and our State Constitution, such as

consent." After reviewing the testimony and relevant case law,

the judge found "the police entry into the Ross Court residence

to arrest the defendants was lawful because [defendant] consented

to the entry." He elaborated:

 It is noteworthy that [defendant's] initial
 statement to Rogalski is quite different from
 his testimony at the hearing. [Defendant]
 testified during the suppression hearing that
 he did not know the police were present. He
 stated that he heard a boom when police kicked
 in the door and he came out of the bathroom
 where he was confronted by police who put a
 gun in his face and forced him to lie face
 down on the floor where he was handcuffed.
 This testimony differs not only from the
 version of the officers who testified during
 the hearing, but also differs significantly
 in key aspects from [defendant's] own
 statement initially provided to Rogalski on
 March 2, [2013], within hours of the event.
 During his initial statement[,] [defendant]

 16 A-5772-14T4
 stated that he knew police were present and
 he opened the garage door and [laid] down in
 the hallway in order to be cooperative. This
 initial statement by [defendant] to Rogalski
 not only explains the opening of the garage
 door, but is consistent with the testimony of
 police: [Lt.] Pharo and [O]fficer Conforti
 testified that police walked around the house,
 knocking on the door and identifying
 themselves while calling to the occupants to
 make their presence known, and that the garage
 opened and [defendant] came to the threshold
 of the interior garage door with his hands up
 and was then taken into custody. With regard
 to the circumstances of the police entry into
 the residence, I find [defendant's] initial
 version given during his taped statement to
 Rogalski to be the more credible version: it
 was given close in time to the event, before
 he had any opportunity to reflect and
 fabricate; and is also corroborated by the
 police testimony. Accordingly, I find that
 [defendant] consented to the police entry,
 that [defendant] heard police and opened the
 garage door and came to the threshold of the
 interior garage door with his hands up
 surrendering to police and that he intended
 to let the police into the residence.

 In reviewing a motion to suppress, an appellate court defers

to the trial court's factual and credibility findings, "so long

as those findings are supported by sufficient credible evidence

in the record." State v. Handy, 206 N.J. 39, 44 (2011) (quoting

State v. Elders, 192 N.J. 224, 243 (2007)). Deference is afforded

"because the 'findings of the trial judge . . . are substantially

influenced by his [or her] opportunity to hear and see the

witnesses and to have the "feel" of the case, which a reviewing

 17 A-5772-14T4
court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015)

(quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "An

appellate court should disregard those findings only when a trial

court's findings of fact are clearly mistaken." State v. Hubbard,

222 N.J. 249, 262 (2015). The legal conclusions of a trial court

are reviewed de novo. Id. at 263. We must focus on "whether the

motion to suppress was properly decided based on the evidence

presented at that time." State v. Gibson, 318 N.J. Super. 1, 9

(App. Div. 1999) (quoting State v. Jordan, 115 N.J. Super. 73, 76

(App. Div.), cert. denied, 59 N.J. 293 (1971)).

 Here, it is undisputed that the police walked around the

house, knocked on the door, and otherwise made their presence

known to the home's occupants. It is further undisputed that

neither the police nor Sophia activated the garage door opener.

We discern no error in the motion judge accepting as credible

defendant's initial recorded statement in which he indicated he

heard the police knock and responded by opening the garage door.

He then cooperated with the police entry into the home to

effectuate his arrest. On these facts, we find no basis to disturb

Judge Hodgson's well-reasoned determination that defendant was

validly arrested. "The Constitution protects against unreasonable

searches and seizures and against coerced waivers of

constitutional rights. It does not disallow voluntary cooperation

 18 A-5772-14T4
with the police." State v. Domicz, 188 N.J. 285, 308-09 (2006).

Moreover, as the judge correctly recognized, this motion turned,

at least in part, on a credibility question. The judge found

defendant's testimony at the suppression hearing incredible and,

although not explicitly stating so, found the police testimony

credible.

 The judge additionally found the police entry into the home

was valid because Frank, its owner, "knowingly consented and agreed

to allow the entry and even sent his daughter Sophia to assist."

Certainly, factual support for this conclusion is found in Sophia's

unequivocal testimony that Frank said he gave the police permission

to enter the home and asked her to let the police in. Indeed, in

the context of the search of a home, both the United States Supreme

Court and our Supreme Court have recognized that a third party can

validly consent to a search in certain circumstances. United

States v. Matlock, 415 U.S. 164, 170-71, 94 S. Ct. 988, 992-93,

39 L. Ed. 2d 242, 249-50 (1974); State v. Cushing, 226 N.J. 187,

199 (2016). "The third party's ability to consent to such a search

rests on his or her 'joint occupation' of and 'common authority'

over the premises." Cushing, supra, 226 N.J. at 199 (quoting

Fernandez v. California, ___ U.S. ___, ___, 134 S. Ct. 1126, 1132-

33, 188 L. Ed. 2d 25, 32-33 (2014)). Moreover, depending on the

circumstances, the law enforcement officer may rely on the apparent

 19 A-5772-14T4
authority of a person to consent to a search. Illinois v.

Rodriguez, 497 U.S. 177, 185-89, 110 S. Ct. 2793, 2800-02, 111 L.

Ed. 2d 148, 159-61 (1990).

 We note, however, again in the context of a search under the

consent exception to the warrant requirement, that the State must

prove "the consent was voluntary and that the consenting party

understood his or her right to refuse consent." State v.

Maristany, 133 N.J. 299, 305 (1993). The State must prove

voluntariness by "clear and positive testimony." State v. Chapman,

332 N.J. Super. 452, 466 (App. Div. 2000) (quoting State v. King,

44 N.J. 346, 352 (1965)). Furthermore, the State must show that

the individual giving consent "knew that he or she 'had a choice

in the matter.'" State v. Carty, 170 N.J. 632, 639 (quoting State

v. Johnson, 68 N.J. 349, 354 (1975)), modified by 174 N.J. 351

(2002).

 Guided by these criteria, we have no doubt that Frank gave

permission to the police to enter his home, and dispatched Sophia

to assist them. Notwithstanding, because the record does not

reflect that Frank was informed of his right to refuse consent,

or otherwise knew he had a choice in the matter, we are constrained

to find his consent was not voluntary. We do not deem this finding

fatal to the validity of defendant's arrest however, because

ultimately the police did not avail themselves of Frank's consent

 20 A-5772-14T4
or Sophia's assistance to enter the home. Rather, as we have

noted, they lawfully relied on defendant's own conduct and actions

in opening the garage door so the police could enter the home to

effectuate his arrest.

 C.

 We next address defendant's contention that his statement,

along with all evidence seized, must be suppressed as products of

the unlawful police entry into the home. In rejecting this

argument, we adopt Judge Hodgson's well-reasoned analysis:

 Having found . . . probable cause
 [existed] to arrest defendants and that the
 entry into the residence was consensual and
 therefore lawful, the evidence recovered
 pursuant to the search warrants and statements
 obtained are not "poisoned fruit" and are
 therefore admissible. However, [assuming]
 arguendo, even if the entry were found to be
 unlawful, the statements would be admissible
 since courts have generally declined to apply
 the exclusionary rule to statements obtained
 where probable cause existed prior to the
 unlawful conduct. New York v. Harris, 495
 U.S. 14, 17-19[, 110 S. Ct. 1640, 1642-44,
 109 L. Ed. 2d 13, 20-22] (1990) (the Supreme
 Court addressed a case in which the police
 illegally entered defendant's home in order
 to effect his arrest for which they had
 probable cause. . . . [T]he arrest was
 otherwise legal, although the entry into the
 house without a search warrant violated
 Payton.6 In Harris, the Court declined to
 suppress defendant's confession). See also,
 State v. Bell, 388 N.J. Super. 629, 637 (App.

6
 Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d
639 (1980).

 21 A-5772-14T4
Div. 2006) (the [C]ourt cited Harris and
"decline[d] to apply the exclusionary rule in
this context because the rule in Payton was
designed to protect the physical integrity of
the home; it was not intended to grant
criminal suspects, like Harris, protection for
statements made outside their premises where
the police have probable cause to arrest the
suspect for committing a crime."). In this
case, and as explained in Harris, "the
statement[s], while the product of an arrest
and being in custody, [were] not the fruit of
the fact that the arrest was made in the house
rather than someplace else." [Harris, supra],
495 U.S. [at] 20 [].

 In the instant case, probable cause to
arrest defendants was established by the
statements of the victim [T.M.], and exists
independently of the entry. [] Similarly,
because the probable cause supporting the
search warrant does not rely on any illegally
obtained evidence, the recovery of the gun and
drugs would also not be considered poisoned
fruit and not subject to suppression. In
addition, it is not necessary to assess the
subject searches under the attenuation
doctrine since the probable cause is
established in the warrants without reference
to any illegally obtained evidence. As the
Supreme Court in Harris explained, "[the]
attenuation analysis is only appropriate
where, as a threshold matter, courts determine
that 'the challenged evidence is in some sense
the product of illegal government activity.'"
[Harris, supra], 495 U.S. at 19[, 110 S. Ct.
at 1642-43, 109 L. Ed. 2d at 21] (citing United
States v. Crews, [445 U.S. 463], 471 [, 100
S. Ct. 1244, 1250, 63 L. Ed. 2d 537, 546
(1980)]. "[T]he exclusionary rule enjoins the
Government from benefiting from evidence it
has unlawfully obtained; it does not reach
backward to taint information that was in
official hands prior to any illegality[.]"

 22 A-5772-14T4
 [Crews, supra, 445 U.S. at 475, 100 S. Ct. at
 1252, 63 L. Ed. 2d at 548].

 . . . .

 In this case[,] the probable cause
 supporting the search warrants is established
 by the statements of [T.M.] and [Katerina],
 which are not the product of any illegal
 government activity. [] For the foregoing
 reasons, even were the entry of the residence
 at Ross Court to be found unlawful, the
 statements from [Katerina] and defendant as
 well as the items recovered pursuant to the
 search warrants would not be "poisoned fruit"
 and subject to the exclusionary rule.

 D.

 For the first time on appeal, defendant argues that Sophia's

joint participation with police brings her conduct within the

purview of the exclusionary rule. Specifically, he contends that

the empty wax folds and drug paraphernalia Sophia found in the

bathroom should be suppressed on this basis. We do not find this

argument persuasive.

 Defendant cites State v. Scrotsky, 39 N.J. 410 (1963), to

support his position. However, we deem defendant's reliance on

Scrotsky misplaced. In that case, police brought a landlady to

defendant's apartment when he was not home so she could search for

articles she claimed were stolen. The Court concluded that the

warrantless search was unlawful because the landlady entered the

apartment with the officers "and seized the property under color

 23 A-5772-14T4
of their authority and as a participant in a police action." Id.

at 415.

 In the present case, it was Frank, not the police, who

requested that Sophia go to the residence. After police conducted

a protective sweep of the home, they allowed Sophia to enter and

remain inside while they secured a search warrant. During this

period, Sophia was confined to the kitchen and bathroom.

Importantly, Sophia testified unequivocally that she was not asked

or directed by the police to search for anything. Rather, she

inadvertently discovered the items when she used the bathroom and

noted the cabinet doors were not shutting properly. She then

turned the items over to the police. The police did not search

the home, or seize the items Sophia discovered, until a search

warrant was obtained. Accordingly, defendant's contention that

Sophia was a "joint participant" in the police search of the home

lacks record support.

 E.

 Defendant in his supplemental brief also argues that the

protective sweep of the home was unreasonable and violated his

Fourth Amendment rights. This argument warrants little

discussion.

 In Maryland v. Buie, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098,

108 L. Ed. 2d 276, 286 (1990), the United States Supreme Court

 24 A-5772-14T4
authorized a "protective sweep" exception to the warrant

requirement for a search conducted in conjunction with an arrest,

carefully limiting the search to "spaces immediately adjoining the

place of arrest from which an attack could be immediately

launched." Our Supreme Court has

 limited the protective sweep of a home to
 settings in which "(1) police officers are
 lawfully within the private premises for a
 legitimate purpose, which may include consent
 to enter; and (2) the officers on the scene
 have a reasonable articulable suspicion that
 the area to be swept harbors an individual
 posing a danger." [State v. Davila, 203 N.J.
 97, 102 (2010)]. This Court has also imposed
 strict constraints on the duration and scope
 of the protective sweep in the residential
 setting. Ibid.; accord State v. Cope, 224
 N.J. 530, 548 (2016).

 [State v. Robinson, ___ N.J. ___, ___ (2017)
 (slip op. at 18-19).]

 Here, the police conducted a protective sweep of the home

after defendant and Katerina were removed. In sustaining the

validity of the protective sweep, Judge Hodgson found "the officers

had a reasonable basis to perceive danger after receiving a report

from dispatch that a man was just robbed at gunpoint. Therefore,

the protective sweep was reasonable to ensure officer safety."

"Further, [the] officers were justified in securing the residence

pending a search warrant." We agree with these well-reasoned

conclusions. Moreover, defendant points to no evidence that was

 25 A-5772-14T4
discovered or seized during the limited protective sweep, which

was conducted for the officers' safety while they secured the home

pending issuance of the search warrant.

 F.

 We have considered defendant's other contentions in light of

the record and applicable legal principles and conclude they are

without sufficient merit to warrant extensive discussion in a

written opinion. R. 2:11-3(e)(2). We add only the following

comments.

 Defendant challenges the admissibility of Katerina's

statement on the grounds that she was high on drugs and the police

did not re-administer Miranda warnings to her upon resuming her

interrogation. However, as the State correctly points out,

defendant lacks standing to assert Katerina's rights against self-

incrimination. State v. Baum, 199 N.J. 407, 420-26 (2009). In

any event, after reviewing the testimony and evidence, Judge

Hodgson concluded that "[Katerina] knowingly, intelligently, and

voluntarily waived her Miranda rights," and her "will had not been

overborne and the requirements of due process had not been

violated." Having reviewed the record, we discern no basis to

disturb the judge's factual findings and legal conclusions.

 Defendant argues in his pro se brief that his guilty plea is

invalid and must be vacated. However, defendant withdrew his

 26 A-5772-14T4
motion to vacate his guilty plea, thereby depriving the trial

court of the opportunity to decide the issue. Similarly, while

defendant now argues that the State failed to present exculpatory

evidence to the grand jury (specifically, the fact that T.M.

recanted his allegations that a robbery occurred), defendant did

not move to dismiss the indictment on this basis. "Generally, an

appellate court will not consider issues, even constitutional

ones, which were not raised below." State v. Galicia, 210 N.J.

364, 383 (2012). To the extent defendant attributes these or any

other errors to the ineffective assistance of counsel, such claims

involve allegations and evidence that lie outside the trial record

and are thus more appropriately addressed in a post-conviction

proceeding. State v. Preciose, 129 N.J. 451, 460 (1992).

 Affirmed.

 27 A-5772-14T4